MISSISSIPPI VALLEY GAS
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

Nos. 79–1598, 80–3489.

United States Court of Appeals,
Fifth Circuit.*

Oct. 15, 1981.

* Former Fifth Circuit case, Section 9(1) of Public
Law 96–452—October 14, 1980.

John M. Kuykendall, Jr., Overstreet, Kuykendall, Sumners, Hughes & Howorth, Jackson, Miss., J. Michel Marcoux, Bruder & Gentile, Washington, D. C., for Mississippi Valley Gas Co.

John E. Holtzinger, Jr., Paul H. Keck, John T. Stough, Jr., Morgan, Lewis & Bockius, Washington, D. C., Albert G. Norman, Jr., Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Atlanta Gas Light Co.

William A. Major, Jr., Associate Gen. Counsel, Birmingham, Ala., James J. Flood, Jr., Farmer, Wells, McGuinn, Flood & Sibal, Washington, D. C., for Southern Natural Gas Co.

Reuben Goldberg, Channing D. Strother, Jr., Goldberg, Fieldman & Letham, P. C., Washington, D. C., for intervenor, Chattanooga Gas Co.

Peyton G. Bowman, III, Reid & Priest, Washington, D. C., Randolph R. Mahan, George Fischer, III, Columbia, S. C., for South Carolina Elec. & Gas Co.

Andrew M. Zack, Jerome Nelson, Sol., George H. Williams, Jr., Barbara J. Weller, Robert R. Nordhaus, Gen. Counsel, FERC, Washington, D. C., for respondent.

Robert G. Simon, Stanley M. Morley, Joel F. Zipp, Washington, D. C., for Carolina Pipeline Co.

Harold L. Talisman, James T. McManus, Michael J. McDanold, Washington, D. C., for Alabama Gas Corp.

Edward J. Greiner, Jr., Richard P. Noland, Richard A. Oliver, Washington, D. C., for Georgia Indus. Group.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

This case involves two consolidated petitions for review brought by Mississippi Valley Gas Company ("Mississippi Valley"), arising from two separate, but related, proceedings before the Federal Energy Regulatory Commission ("Commission"), dealing with the elimination of the mileage-based zonal system historically utilized by Southern Natural Gas Company ("Southern") to allocate transportation charges. It pits Mississippi Valley not only against the Commission, but also against several intervenors as well, all of whom support the Commission.[1] In the petition bearing this court's docket number 79–1598, Mississippi Valley attacks the Commission's order of November 30, 1978,[2] accepting Southern's rate increase filing which also provided for the phased elimination of the mileage-based zones. Mississippi Valley maintains that the filing was patently invalid not complying with the Commission's filing requirements and contravening the terms of a stipulation. In the petition bearing this court's docket number 80–3489, Mississippi Valley attacks the Commission's opinion[3] approving a settlement providing for the phased elimination of Southern's mileage-based allocation of transportation cost among its

customers and authorizing the use of a volumetric method of determining such costs. Mississippi Valley raises various objections to the Commission's opinions, among them that a volumetric method of allocation is unjust and unreasonable, and that the Commission failed to carry the burden of proving that the historical mileage-based method of allocation was unjust or unreasonable. Finding no merit in these arguments, we affirm the Commission's decisions in both petitions.

## I. FACTS

The facts regarding the characteristics of Southern's transmission system are in large part not in dispute. Southern operates an interstate transmission pipeline system which extends approximately 1,000 miles from producer fields at its western terminus through Louisiana, Mississippi, Alabama, Georgia and South Carolina. Within Georgia, three major laterals serve markets in the north as far as the Tennessee border and in the southeast to the cities of Savannah and Brunswick, Georgia, on the Atlantic coast. In 1963, the Commission approved a mileage-based allocation of Southern's transmission costs on the basis of rate zones.[4] At that time, the gas flowed in a uniform easterly direction from Southern's western extremity. The Commission concluded that, in those circumstances, mileage was the "compelling factor to be considered in the allocation of transmission costs on Southern's system."[5] Three zones were established: Zone 1 includes Louisiana and Mississippi; Zone 2 includes Alabama and western Georgia; and Zone 3 includes the

1. The intervenors in both petitions are Southern and other customers of Southern, namely, Chattanooga Gas Company ("Chattanooga"), Atlanta Gas Light Company ("Atlanta"), and South Carolina Electric & Gas Company ("South Carolina").

2. Docket No. RP79–71, Order Accepting for Filing and Suspending Proposed Rate Increase, Rejecting Proposed Tariff Sheets, Granting Intervention and Initiating Hearing, issued November 30, 1978. 43 F.R. 58,420 (Dec. 14, 1978).

3. Docket No. RP78–36, Opinion No. 83, Opinion and Order Affirming Initial Decision and Approving Settlement Agreement, issued March 27, 1980; and Opinion No. 83–A, Opinion and Order Denying Rehearing, issued June 3, 1980.

4. *Southern Natural Gas Co.*, 29 F.P.C. 323, modified, 29 F.P.C. 779, *petition for review dismissed, Southern Natural Gas Co. v. FPC*, No. 14399 (3d Cir., Nov. 22, 1963).

5. *Id.* at 780.

rest of Georgia, parts of Florida, Tennessee and South Carolina. Under this zone rate structure, Southern's rates to its Zone 1 customers have been lower than those charged to Zone 2 customers, which in turn are lower than those charged to Zone 3 customers.[6] Petitioner Mississippi Valley, a gas distribution company operating wholly within the State of Mississippi, received the lowest transportation charge possible. The customer intervenors, Chattanooga, Atlanta and South Carolina, are all Zone 3 customers.

In July, 1978, Southern began receiving liquified natural gas ("LNG") imported from Algeria in significant amounts.[7] The gas is received and stored by Southern Energy Company in Savannah, Georgia. Southern Energy regasifies the LNG, at which time the gas is sold to Southern and enters its pipeline. The LNG gas flows up the Savannah lateral to Southern's main line, where it flows both eastward and westward to delivery points. In the winter months, the LNG will be used primarily to serve the Savannah line and eastward customers, but in the summer months, part of the gas will backflow down the main line where at some point it will be blended with domestic gas from the west. Accordingly, some delivery points will be served with 100 percent regasified LNG, and some with only domestic gas. The volumes and flows of the gas will vary according to requirements, interruptions in supply, curtailment and season. Occasionally, some LNG may reach Zone 2, but at no time will the regasified LNG reach Zone 1.

## II. PROCEEDINGS BEFORE THE COMMISSION

### A. No. 80–3489 in this Court (No. RP78–36 in the Commission).

Although the petition in No. 80–3489 was filed second in this court, it arises from the first proceeding initiated before the Commission, i. e., Docket No. RP78–36 in the Commission, filed on January 30, 1978. In anticipation of receipt of LNG, Southern filed a proposed rate increase pursuant to § 4 of the Natural Gas Act ("NGA"), 15 U.S.C.A. § 717c (West 1976), to reflect costs associated with the introduction of the LNG. The Commission accepted the filing on February 27, 1978, suspended the increase until August 1, 1978, and initiated a hearing. In its rate proposal, Southern proposed to maintain its historical mileage-based allocation of transmission costs with modifications to take account of the introduction of LNG.[8] Mississippi Valley and

---

**6.** Costs for transportation are allocated among the three zones by determining the weighted average miles traveled for the haul to each customer's delivery point. The weighted average miles traveled is determined on the basis of a peak demand rate and an annual delivery commodity rate. The process for calculating average miles traveled is the same for the demand and the commodity components. For example, in calculating the demand component, a three-day peak demand period is selected. Beginning at the western end of the line, the amount of gas from the first production source is multiplied by the miles to the second production source. This results in a total Mcf/miles for the first amount of westernmost gas to the second production point. The amount of gas flowing from the second production point to the third production point is multiplied by miles between the second and third point, yielding a second Mcf/miles figure which is added to the Mcf/mile figure as of the second production point. The total Mcf/mile figure at the third production point is divided by total Mcf at that point to give the weighted average miles traveled at the third production point.

This process continues for each production point and delivery point, with the appropriate deductions for deliveries and use as compressor fuel, to determine weighted average miles traveled to each point. The weighted averaged miles traveled are then grouped by zones to determine the appropriate zone. (Joint Appendix, ("J.A.") at p. 541).

**7.** For the relevant test year, LNG constituted about 17% of Southern's total supply. (J.A. p. 355).

**8.** The modifications consisted of subtracting from the amount of gas flowing from the west, the amount of LNG delivered to a point, for the purposes of calculating the Mcf/miles for western gas at that point and the weighted average miles traveled for that point. Then a demand and commodity component for weighted average miles traveled by LNG to that point are calculated. The weighted average miles traveled by LNG and western gas are added to give the total weighted average miles traveled. (J.A. p. 542).

Southern's other customers in Zone 1 supported this proposed modification of the mileage-based allocation method. Southern's eastern customers, including Atlanta, Chattanooga and South Carolina, as well as the Commission's staff, contended that zoned rates had long been outmoded on Southern's system and that the introduction of LNG now even more forcefully compelled their elimination. The parties were able to settle all issues except those relating to zoning and transmission cost rate design and to the treatment of certain administrative and general costs assigned to transmission and certain costs for transmission and compression of gas purchased from other companies. The settlement was embodied in a unanimous stipulation dated November 3, 1978, ("Stipulation I"), which the Commission approved on February 23, 1979, specifying the procedure to be used in resolving the rate design problem. Article II of that stipulation provided in part that "all issues and aspects of the cost classification, cost allocation (including zoning) and rate design" would be resolved in public hearings beginning on November 28, 1978.[9]

On the first day of the November 28, 1978, hearing, most of the parties requested permission to defer presentation of their case in light of continuing negotiations on the rate zoning issue. Mississippi Valley and one other party not before this court chose to present their evidence. On the following day, November 29, 1978, all parties except Mississippi Valley, the Mississippi Commission, and Vicksburg Water and Gas Administration entered another stipulation ("Stipulation III"), resolving the zoning issue by phasing out the old rate-zone allocation system and beginning a volumetric system.[10] (J.A. pp. 231–238) Although Southern had proposed in its initial rate filing to maintain a modified zoning allocation of costs, it joined in Stipulation III. Because of the compromise, several parties, including Southern, chose not to put in evidence the testimony they had prefiled with the Commission. Instead, Southern, the Commission's staff, and Atlanta adopted the compromise as their direct case and supported it with testimony of several witnesses. (J.A. pp. 146–154; 239–248; 262–271; 296–305). Mississippi Valley, thereupon, cross-examined several of these witnesses, but declined the Administrative Law Judge's ("ALJ") invitation to introduce additional evidence bearing on the adoption of a volumetric system. (J.A. pp. 158–224). The ALJ on March 9, 1979, issued his initial decision approving Stipulation III *in toto*.

Stipulation III eliminated Southern's three zone rate differentials on a phased basis in order to reduce the sudden monetary impact which would otherwise occur to Southern's customers by an immediate elimination of rate zones. During the first phase (August, 1978, through April, 1979), the status quo would be continued; during the second phase (May, 1979, through April, 1980), two-thirds of Southern's transmission costs would be allocated on the zoned-rate basis and one-third on a volumetric basis; during the third phase (May, 1980, through April, 1981), one-third of Southern's trans-

9. A second stipulation, dated December 12, ("Stipulation II") agreed that the issues of the treatment of certain administrative and general costs and certain costs for transmission and compression of gas by others remained to be resolved.

10. The parties before this court describe the alternative to the rate zones for transportation costs as "volumetric," and state that this method eliminates the weighing of distances of haul to different customers. (Mississippi Valley initial brief, p. 4). Although Stipulation III provided for a phase out of the mileage factor in calculating transportation costs, it retained a demand and commodity element for other transportation costs. (Article II, Stipulation III, J.A. pp. 382–383). The demand element allocates a portion of fixed costs among customers while the commodity element allocates variable costs and the remaining fixed costs. See *United Gas Pipeline Co.*, 50 F.P.C. 1348 (1973), aff'd sub nom. *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176 (D.C.Cir.1975) and *Atlantic Seaboard Corp.*, 11 F.P.C. 43 (1952), aff'd in part sub nom. *State Corporation Commission of Kansas v. FPC*, 206 F.2d 690 (8th Cir. 1953), cert. denied, 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954). Thus, although we describe Stipulation III as adopting a volumetric system, this signifies only that Stipulation III eliminated the mileage of haul element from transportation costs.

mission costs would be allocated on the zoned-rate basis and two-thirds on a volumetric basis; and beginning May, 1981, zone differentials would be discontinued and Southern's transmission costs would be allocated systemwide on a volumetric basis.

Before the Commission, Mississippi Valley urged the adoption of the modified rate zone allocation of transmission costs originally proposed by Southern in its January 30, 1978, rate filing. The primary objection made by Mississippi Valley was that the ALJ had failed "to offer any convincing reason that the methodology propounded by Southern in its rate filing cannot be used to compute average miles of haul after LNG. Zoning should not be eliminated in the absence of any such reason." (J.A. p. 901). Mississippi Valley also objected to the procedure provided for in Stipulation III which permitted the proponents of the agreement to forego the full presentation of their case in order to support the agreement, while retaining the right to reopen the record to present evidence on their original positions should the proposed settlement be rejected or modified by the Commission. A final objection was that Florida Gas, a Zone 1 customer who also purchased from Southern transportation services for its own gas, was given a preferential, mileage-based rate for such transportation service. The Commission, with Commissioner Holden dissenting, affirmed the ALJ in full in Opinion No. 83.

In its petition for rehearing filed on April 25, 1980, Mississippi Valley raised many of the same arguments it had previously raised, and in addition, directed the Commission's attention to the fact that Algeria had cut off deliveries of LNG to Southern. The Commission denied rehearing, noting that sufficient LNG remained in storage to continue deliveries through the 1980–1981 winter, and that it would reconsider the issue in the event Southern Energy had to abandon its facilities. Commissioner Holden again dissented on the same grounds as in his prior dissent; however, he too rejected Mississippi Valley's argument that the cut-off of Algerian LNG mandated retention of the rate zones. Mississippi Valley filed a timely petition for judicial review in this court pursuant to § 19 of the NGA, 15 U.S.C.A. § 717r.

**B. No. 79–1598 in this Court (No. RP79–7 in the Commission).**

On October 31, 1978, three days before Stipulation I, Southern filed a second rate increase ("October 31st filing"), pursuant to § 4 of the NGA, initiating Docket No. RP79–7. This second filing proposed increases in rates and anticipated Stipulation III by proposing the same phase-out of rate zones eventually adopted by that stipulation.[11] Southern indicated in its rate filing that allocation, rate design, and zoning were issues pending in Docket No. RP78–36, and that at the hearings scheduled for November 28, 1978, it would present the rates proposed in this second filing as a rate alternative. On November 14, 1978, Mississippi Valley moved that Southern's October 31st rate filing be rejected in those parts relating to the phase-in of a volumetric system of charging transmission costs. Mississippi Valley maintained that the filing did not comply with the Commission's regulations because the evidence submitted by Southern in support of the filing did not support the phased elimination of zones. That evidence contained testimony of Southern officials acknowledging the feasibility of continued zonal allocation, but proposing a phase-in of volumetric allocation to protect Southern from undercharging in

---

**11.** Although the Commission had not given a final decision on Southern's rate filing of January 30, 1978, there was no statutory bar to Southern's filing an additional rate increase before such final increase. Filing a second rate increase during the pendency of its original rate increase before the Commission protected Southern from any increased costs occurring while the Commission decided the first rate filing and permitted Southern to implement sooner the rates proposed in the second filing. While the Commission, of course, may suspend the second filing and require a refund of any excess collected after such suspension, the second filing protects Southern from undercollections. Mississippi Valley did not oppose the October 31st filing in those parts relating to increased rates.

certain zones in case zones were eliminated. Mississippi Valley also claimed Stipulation I barred the part of the filing relating to rate zones. On November 30, 1978, the Commission denied Mississippi Valley's motion, accepted the rate for filing,[12] and suspended it for five months until May 1, 1979. Mississippi Valley filed a timely petition for rehearing, which was denied by operation of law.[13] Mississippi Valley subsequently filed a timely petition for review of the Commission's November 30, 1978, order.[14]

In Part III of this opinion, we will discuss Mississippi Valley's challenge to the October 31st filing. In Part IV, we will discuss its challenges to the Commission's approval of Stipulation III.

### III. OCTOBER 31ST FILING

■ Mississippi Valley makes two arguments challenging the October 31st filing with respect to those parts proposing a phase out of rate zones. First, Mississippi Valley maintains that Stipulation I prohibited Southern from unilaterally filing a proposed change in rate design. Stipulation I reads in pertinent part:

The parties submit that all issues and aspects of the cost classification, cost allocation (including zoning) and rate design on the Southern System must be resolved in the public hearings scheduled to commence on November 28, 1978, in Phase I of this [Docket No. RP78–36] proceeding. (R. 1314). Mississippi Valley contends that in Stipulation I, Southern bargained away any right it had under the NGA to file any change in its method of cost classification, allocation, zoning and rate design in any docket other than Docket No. 78–36. In other words, Southern had agreed to adhere to the traditional method of cost allocation and retain the mileage factor in any subsequent rate filing until resolution of the mileage allocation issue in Docket No. 78–36. This claim is analogous to those often made under the *Mobile-Sierra*[15] doctrine that a contract bars a party from filing unilaterally any change in rates or terms of service. Second, Mississippi Valley contends that the October 31st filing did not comply with § 154 of the Commission's Regulations, 18 C.F.R. § 154, especially § 154.-63(f) *Statement J*, specifying information to

---

**12.** The Commission rejected other parts of the filing. No party has petitioned this court for review of the rejection of those parts.

**13.** Section 19(a) of the NGA, 15 U.S.C.A. § 717r(a) (West 1976) provides:

(a) Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time,

upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

**14.** The Commission's brief informs this court that on April 19, 1979, most of the parties in Docket No. RP79–7 agreed to a proposed stipulation ("RP79–7 stipulation"), holding the proceedings in Docket No. RP79–7 in abeyance pending the Commission's disposition of the zoning issue in Docket No. RP78–36. Southern specifically agreed to make refunds in Docket No. RP79–7 in accordance with the final order in Docket No. RP78–36. Mississippi Valley declined to support or oppose the RP79–7 stipulation which was then certified to the Commission by the ALJ. On August 10, 1979, the Commission issued a notice of certification of the proposed RP79–7 stipulation and called for interested parties to comment.

**15.** *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).

be filed when a filing pertains to allocation of cost by service.[16]

### A. Reviewability of Mississippi Valley's Challenge to the October 31st Filing.

■ The Commission raises the threshold issue of reviewability, maintaining that its order accepting the October 31st filing is not reviewable. Of course, if material issues of fact remained to be resolved, we would not have jurisdiction as there would be no finality. However, Mississippi Valley's arguments raise no factual issues, but rather assert that the Commission should have rejected the October 31st filing as a matter of law. We, therefore, must decide whether we have jurisdiction under § 19(b) of the NGA, 15 U.S.C.A. 717r(b) (West 1976), to review this Commission order denying Mississippi Valley's motion to reject the October 31st filing.

Section 19(b) provides in pertinent part: Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States

. . . .

15 U.S.C.A. § 717r(b) (West 1976). Although this statute does not impose a requirement of ripeness on the Commission's orders to establish jurisdiction for judicial review, the courts have long held that orders under this provision must be ripe for judicial review before they will address the merits of any petition. *FPC v. Metropolitan Edison Co.*, 304 U.S. 375, 58 S.Ct. 963, 82 L.Ed. 1408 (1938); *Pennzoil Company v. FERC*, 645 F.2d 394 (5th Cir. 1981); *ECEE, Inc. v. FERC*, 611 F.2d 554 (5th Cir. 1980).

■ A determination of ripeness is by no means easy. The Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), held that the issue of ripeness for judicial review requires a court to evaluate both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515. The Supreme Court set out four important factors: (1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes "final agency action" within the meaning of § 704 of the Administrative Procedure Act, 5 U.S.C.A. § 704 (West 1977); (3) whether the challenged agency action has or will have a direct and immediate impact upon the petitioner; and (4) whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency. *Abbott Laboratories v. Gardner*, 387 U.S. at 149–54, 87 S.Ct. at 1515–18; *Pennzoil Co. v. FERC, supra; ECEE, Inc. v. FERC, supra.*

To better understand whether these claims made by Mississippi Valley are reviewable, a brief explanation of the procedure for implementing changes in terms and rates on file with the Commission would be helpful. Under the NGA, a gas pipeline subject to the Commission's jurisdiction must adhere to the rates and terms on file. To change these rates and terms, the utility must file a proposed change with the Commission 30 days before the change is to take effect. Section 4(d). The Commission has the authority to reject summarily those filings which are grossly defective in form, or are "so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket." *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1346 (D.C.Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). Once the Commission accepts a filing, it may suspend the proposed change for up to five months, during which time the Commission may conduct hearings to determine whether the proposed change is just and reasonable. If the Commission has not reached such a de-

---

**16.** Mississippi Valley also argues before us that Southern's filing did not comply with the requirements of § 4(d) of the NGA that a filing give notice to the public and state plainly the changes to be made. Mississippi Valley made this argument neither in its motion to reject Southern's filing or in its petition for rehearing before the Commission. We shall not address this argument raised for the first time in this petition.

termination at the end of the suspension period, the proposed change takes effect. If the change is an increase in rates, the Commission may require a refund if the rates are ultimately determined to be excessive.

■ Rejection of a rate filing is clearly a final order. It is conceded by Commission's counsel that rejection of a rate filing is reviewable and this concession is echoed in the case law. *Appalachian Power Co. v. FPC*, 529 F.2d 342 (D.C.Cir.), *cert. denied*, 429 U.S. 816, 97 S.Ct. 58, 50 L.Ed.2d 76 (1976). *See also FPC v. Texaco, Inc.*, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); *Papago Tribal Utility Authority v. FERC*, 628 F.2d 235, 241 n.16 (D.C.Cir.), *cert. denied*, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980) (*Papago II*). However, the determination to accept a rate filing is interlocutory. It merely initiates the proceeding which typically involves an extensive hearing. Acceptance of a rate filing implies nothing concerning the merits of the case. It is only after a hearing that the merits are resolved. Yet, although the Commission's acceptance of the October 31st filing at issue is interlocutory, it may nevertheless be reviewable under the *Mobile-Sierra* doctrine.

■ The *Mobile-Sierra* doctrine applies where a contract between parties purports to limit the legality of the filing. *See Richmond Power & Light Co. v. FPC*, 481 F.2d 490 (D.C.Cir.), *cert. denied*, 414 U.S. 1068, 94 S.Ct. 578, 38 L.Ed.2d 473 (1973). If a utility has bargained away its right to file unilaterally revised rate schedules, then it may not file a change in rates under § 4 of the NGA. More importantly, the Commission must reject a rate filing made in contravention of such contractual obligations upon timely motion of another party to the contract. The primary rationale for the *Mobile-Sierra* doctrine is that it enables a purchaser of gas to enter into a fixed-price contract with the assurance that those rates will not change absent a Commission determination under § 5(a) that the contractual rate is unjust or unreasonable.

The District of Columbia Circuit has consistently reviewed orders of the Commission accepting a rate change filing despite a *Mobile-Sierra* objection. *Papago Tribal Utility Authority v. FERC*, 610 F.2d 914 (D.C.Cir.1979) (*Papago I*); *Borough of Lansdale, Pa. v. FPC*, 494 F.2d 1104 (D.C. Cir.1974); *see also, Papago II* (dictum). In this circuit, the question of reviewability has not been expressly addressed.[17] Although the District of Columbia's analysis in *Papago II* on the reviewability of orders accepting filings despite *Mobile-Sierra* objections is dictum, it is the most thorough exegesis of this question. We have reviewed carefully that reasoning and find it convincing.

We agree with the District of Columbia Circuit that four factors, corresponding to the four factors of *Abbott Laboratories*,[18] point toward the reviewability of a rate filing over an objection based on *Mobile-Sierra* grounds. First, the issue here is purely legal, involving merely an interpretation of Stipulation I. No factual findings need be made by the Commission to resolve this issue. Second, the Commission's decision on this issue is effectively final at this point. Mississippi Valley's *Mobile-Sierra* claim will ordinarily not be an issue in the § 4(e) hearings to determine whether Southern's new method of transportation allocation is just and reasonable. Third, the Commission's decision will have a direct and imme-

---

17. In *Southern Natural Gas Co. v. FPC*, 547 F.2d 826 (5th Cir. 1977), this circuit reviewed the Commission's acceptance of a filing changing Southern's curtailment plan despite protester's motion that the filing be rejected because it contravened the mandate of prior Fifth Circuit opinion in *Louisiana Power & Light Co. v. FPC*, 526 F.2d 898 (5th Cir. 1976). The protester's motion was similar to a *Mobile-Sierra* claim in that they claimed the prior mandate barred such a filing. This circuit reviewed the Commission's rejection of the protester's claim without addressing the question of reviewability.

18. While the District of Columbia Circuit did not expressly correlate its reasoning with *Abbott Laboratories*, the factors it relied upon correspond with the four *Abbott Laboratories'* criteria.

diate impact upon Mississippi Valley. We indicated in *Atlanta Gas Light Co. v. FPC*, 476 F.2d 142 (5th Cir. 1973), that an immediate impact meant the order of the Commission must be "definitive," that is, that the order must have "some substantial effect on the parties which cannot be altered by subsequent administrative action." 476 F.2d at 147.[19] The improper rejection by the Commission of a motion that a filing is barred by *Mobile-Sierra* denies the movant his valuable bargained-for right to have rates charged at the agreed-upon amount for the contractual period. Moreover, the denial of a claim that a rate change is barred under the *Mobile-Sierra* doctrine may eliminate the only effective weapon the movant has to attack a filing. This is graphically illustrated in the petitions before us. The Commission has found Southern's proposed change in method of allocation to be just and reasonable in Docket No. ER78–36, a finding we affirm in Part IV of this opinion. There is nothing in the record to indicate that the result with respect to the October 31st filing should be any different. Thus, the Commission's rejection of Mississippi Valley's *Mobile-Sierra* claim may well end Mississippi Valley's attack on this filing. Fourth, resolution of a claimed *Mobile-Sierra* bar will foster, rather than impede, effective administration by the agency. The court will decide an issue not ordinarily to be decided again by the agency, and its decision affirming the Commission need not interfere with proceedings before the Commission. A judicial determination that there does exist a *Mobile-Sierra* bar to a filing, on the other hand, may result in the elimination of unnecessary proceedings before the agency.

Applying the four *Abbott Laboratories* factors, and following the rule of the District of Columbia Circuit, we conclude that Mississippi Valley's *Mobile-Sierra* claim is reviewable.

### B. Merits of Mississippi Valley's *Mobile-Sierra* Claim.

Mississippi Valley's *Mobile-Sierra* claim is that Article II of Stipulation I prohibited Southern from filing unilaterally any change in its historical rate zones prior to August 1, 1980, except through the Docket No. RP78–36 proceeding.[20] The pertinent part of Article II reads:

> The parties submit that all issues and aspects of the cost classification, cost allocation (including zoning) and rate design on the Southern System must be resolved in the public hearings scheduled to commence on November 28, 1978, in Phase I of this [Docket No. RP78–36] proceeding.

In accepting the October 31st filing, the Commission declared that Stipulation I:

> [P]rovides only for hearing and resolution of the zoning issues, but does not restrict or preclude Southern from filing rates which reflect its position on such issues, and from collecting such rates, subject to refund, pending resolution of such issues.

(R. 1314). We believe the Commission correctly interpreted Stipulation I.

The language of the stipulation does not expressly bar rate filings other than that in Docket No. RP78–36. Indeed, Article IV(b) of Stipulation I anticipates the possibility that Southern would make additional rate filings during the locked-in period to be covered by the Stipulation I.[21] Because the parties anticipated future filings, had they meant to preclude Southern from a particular type of filing, i. e., changes in the zoning

---

**19.** *See Pennzoil Co. v. FERC*, 645 F.2d at 399–400, especially note 10, for cases and summaries in which an immediate and direct impact by an agency's action has been found.

**20.** Mississippi Valley does not argue that Stipulation I barred Southern from filing a rate increase under the historical zoning method. Instead, Southern complains only of that part of the October 31st filing proposing changes in the allocation of transportation costs.

**21.** Article IV(b) provides:

> If Southern files for a rate increase or increases to be effective, including any suspension period, prior to August 1, 1980, [the end of the locked-in period] the provisions of this Stipulation and Agreement shall govern the finally approved level of Southern's jurisdictional rates through the end of the locked-in period.

allocation, Stipulation I should have stated as much in unambiguous terms. This was the issue on which they still disagreed and was so important that had the parties intended to preclude filings reflecting a change in rate design, we think that they would have included such provision in the stipulation. *See Louisiana Power & Light Co. v. FERC*, 587 F.2d 671, 675 (5th Cir. 1979); *Public Service Co. of New Mexico v. FPC*, 557 F.2d 227 (10th Cir. 1977).

Mississippi Valley perceives in Article VI.D. of Stipulation I an exchange whereby Mississippi Valley gave certain assurances to Southern in exchange for Southern's agreement not to file for changes in its transportation cost allocation. If Southern could not change its transportation cost allocation during the pendency of Docket No. RP78–36, then a Commission decision that zones should be abolished possibly would mean that Southern would have to refund excess payments to some zones, but would be unable to collect undercollections from other zones. In such event, Mississippi Valley would have been a major customer in the undercharged zone. Mississippi Valley interprets this Article VI.D. as constituting a promise by Mississippi Valley to reimburse Southern for any such undercollections, should the Commission ultimately abolish zones in Docket No. RP78–36.

Article VI.D. reads:

If Southern is required to make interim and/or final refunds prior to the entry of a final and nonappealable order on the Phase I issues in Article II hereof, Southern shall be entitled (1) to offset any excess interim refunds made to any customer against the final refunds if such final refunds are made pursuant to a final non-appealable order and (2) to collect a rate surcharge to recoup any excess refunds not offset in (1) which surcharge shall be collected in a manner agreed upon by the parties to this proceeding or as determined by the Commission.

This provision, though, provides not only for surcharge, but also for offset. It is clearly related to Article VI.A.–C. which provided for an interim refund during the locked-in period if certain orders were issued by the Commission. It also provided for final refunds at the end of the locked-in period if certain orders had issued. Article VI.D. is designed to correlate any refund given before final approval of rate design with the ultimate refund or revenues due after final Commission approval of rate design. Moreover, Article VI.D. allows Southern to surcharge and offset only to obtain any excess refund made before final determination of rate design. By its own language, it does not protect Southern from undercollection of revenues in the event the Commission were to order the abolition of zones at the conclusion of Docket No. RP78–36. Thus, Article VI.D. cannot be construed as Mississippi Valley's promise to Southern to protect it from undercollections in exchange for its promise not to file changes in transportation cost allocation during the locked-in period.

Finally, although we believe the Stipulation I by its language clearly leaves open the right to Southern to file for rate design change, subject only to the condition that the resolution of the design problem in Docket No. RP78–36 would control that issue in subsequent filings, we are impressed by the fact that the October 31st filing occurred three days before Stipulation I. The absence of any reference in Stipulation I to the October 31st filing is telling.[22] The parties undoubtedly knew of the October 31st filing, but imposed no requirement that it be withdrawn. Had Mississippi Valley wished to terminate that filing, it should have done so in clear, unambiguous language in Stipulation I.

C. Compliance with Commission's Filing Requirements.

Mississippi Valley argues that Southern's October 31st filing clearly did not comply with the Commission's regulations pertaining to the information and supporting data to be included in a filing. *See* 18 C.F.R.

---

22. There is also a question as to whether the October 31st filing would be covered by the terms of Stipulation I occurring three days later.

§ 154.63. Mississippi Valley claims the filing was deficient because the accompanying data included statements by Southern officials indicating their belief that a modified rate zone method of allocating transportation cost was still preferable, despite the October 31st filing's proposal to eliminate zones. Mississippi Valley also claims that data regarding zone allocation or costs required by Statement J of § 154.63(f) of the Commission's regulations was absent. Mississippi Valley therefore claims the filing was patently invalid.

The Commission's regulations preserve to the Commission the right to reject filings deficient in form:

> The Commission reserves the right to reject any material submitted for filing which fails to comply with the requirements set forth in this part.

18 C.F.R. § 154.24 (1980). Clearly, summary rejection of a filing is appropriate where the filing is "patently ... either deficient in form or a substantive nullity." *Municipal Light Boards v. FPC*, 450 F.2d at 1345. However, the Commission has been given discretion to relax its filing requirements since its filing rules are designed to give the Commission necessary information to make an informed decision. *Id.* at 1348; *City of Groton v. FERC*, 584 F.2d 1067 (D.C.Cir. 1978).

In *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), competing carriers argued that an application for temporary operating authority with the Interstate Commerce Commission should be denied because the application violated that agency's filing requirements concerning information to be supplied. The Court there stated:

We agree with the Commission that the rules were promulgated for the purpose of providing the "necessary information" for the Commission "to reach an informed and equitable decision" on temporary authority applications. * * * The rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion * * *. Thus there is no reason to exempt this case from the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party." *NLRB v. Monsanto Chemical Co.* [8 Cir.], 205 F.2d 763, 764. * * *

397 U.S. at 538–539, 90 S.Ct. at 1292. This understanding of filing requirements has been applied to the Commission. *Papago II; Municipal Light Boards v. FPC, supra.*[23] Mississippi Valley has made no showing of substantial prejudice resulting from any deviation from the Commission's regulations, assuming such deviation has occurred. The issues are clear to all parties involved and Mississippi Valley has had an opportunity to present its views on the issues in Docket No. RP78–36. Arguably, any harm suffered by Mississippi Valley is less than that suffered by the protesting carriers in *American Farm Lines v. Black Ball Freight Service, supra,* since in that case the ICC's action authorized the applicant to begin operations, resulting in a real threat of economic loss to the protesting carriers.

 Accordingly, we find that the Commission has not abused its discretion in

---

**23.** *See also Southern Railway Co. v. Seaboard Allied Milling Corp.*, 442 U.S. 444, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979), in which the Supreme Court held nonreviewable an ICC decision under § 15(8)(a) of the Interstate Commerce Act, 49 U.S.C. § 15(8), recodified pursuant to Pub.L. 95–473, Oct. 17, 1978, 92 Stat. 1337 at 49 U.S.C. § 10707, not to suspend or investigate a proposed rate. The statute in question stated that the ICC "may" suspend and investigate rates. The Supreme Court held that a decision not to suspend and investigate was not judicially reviewable because of the intent of Congress, because the ICC's decision was not on the merits, and because the harm to the protesting carriers was slight since they could bring a complaint under another provision of the Interstate Commerce Act which provided them essentially the same tools to attack the rate with only a shift in the burden of proof on one issue.

dealing with the issues relating to compliance with the Commission's filing requirements, and we reject Mississippi Valley's claim that the filing was patently defective.

## IV. STIPULATION III

We now turn to Mississippi Valley's request that we vacate the Commission's approval of Stipulation III, providing for the phased elimination of rate zones to allocate transmission costs. This is the substantive issue on which Mississippi Valley must prevail if Southern is to retain rate zone allocation of transportation costs. Mississippi Valley primarily argues that the Commission did not make the necessary findings under § 5(a) of the NGA and that the evidence does not support a conclusion that the old system was unjust. Mississippi Valley also raises several contentions that the Commission's decision is arbitrary and unreasonable in various aspects, that it creates an illegal preference in one particular, and that it is procedurally defective.

In reviewing a rate order, this court examines only the end result reached and the reasoning expressed by the Commission. *Cities Service Gas Co. v. FERC*, 623 F.2d 1002 (5th Cir. 1980). The expertise of the Commission dictates that a presumption of validity attaches to the Commission's rate orders. The Supreme Court has stated:

> Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise....

*Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968). When the issue before the court is whether costs have been properly allocated, the Supreme Court has warned:

> Allocation of costs is not a matter for the slide-rule. It involves judgment on a myriad of facts. It has no claim to an exact science.

*Colorado Interstate Gas Co. v. FPC*, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206 (1945).

### A. Burden of Proof.

Mississippi Valley argues that the Commission had the burden of proof to find the existing rate zone allocation method to be unjust, unreasonable, unduly discriminatory, or preferential, pursuant to the requirements of § 5(a) of the NGA, before it could order a change in allocation of transmission costs. The validity of Mississippi Valley's claim depends upon whether the Commission's decision was the result of a § 5(a) proceeding or a §§ 4(d) and (e) proceeding. Sections 4(d) and (e) specify the procedure to be followed when a pipeline proposes a change in its rate filing and seeks Commission approval of such proposed rate. Section 5(a) specifies the procedure and burdens to be followed when the Commission finds a rate charged to be unjust and imposes its own rate upon the pipeline.

The procedures and burdens imposed on a pipeline proposing a change in its filing are different from those the Commission shoulders when it imposes a rate upon a pipeline. *Southern Natural Gas Co. v. FPC*, 547 F.2d 826 (5th Cir. 1977). Courts have recognized that § 4(d) allows "greater celerity and flexibility" in establishing rates than that found in § 5. *Ibid* at 832; *Sebring Utilities Commission v. FERC*, 591 F.2d 1003 (5th Cir.), *cert. denied*, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979).

Under § 4(d) of the NGA, the party proposing the change need make no showing at all with respect to the new rate if the Commission does not suspend the proposed change and order a hearing. If the Commission does choose to investigate the proposed change, it determines only whether the proposed change is just and reasonable. Section 4(e) places the burden of justifying a rate increase on the proponent thereof. However, the party proposing the change need not justify those parts of its petitions which make no change in the status quo.[24]

24. In *New Orleans Public Service, Inc. v. FERC*, 659 F.2d 509 (5th Cir. 1981), decided today by this same panel, the petitioner was a pipeline customer arguing that the pipeline, as

*Public Service Commission v. FERC,* 642 F.2d 1335 (D.C.Cir.1980), *U.S. appeal pending.*

Under § 5(a) of the NGA, the Commission has the authority to impose its own rates or terms upon a service under its jurisdiction either on its own motion or on complaint from a third party. To do this, however, the Commission must make a finding that the filed rate or term is "unjust, unreasonable, unduly discriminatory, or preferential," a determination with respect to which the Commission bears the burden of proof. *Public Service Commission v. FERC, supra; Sebring Utilities Commission v. FERC, supra; Northern Natural Gas Co.,* 14 F.P.C. 11 (1955), *aff'd sub nom. Interstate Power Co. v. FPC,* 236 F.2d 372 (8th Cir. 1956), *cert. denied,* 352 U.S. 967, 77 S.Ct. 352, 1 L.Ed.2d 321 (1957). Thus, it is more difficult to effect a change under the § 5(a) procedure. The combined effect of § 4(d) and § 5(a) is to give the regulated utility more flexibility in the design and control of the rates under which it must operate.[25]

In *Public Service Commission v. FERC, supra,* relied upon by Mississippi Valley, a pipeline proposed a rate increase. Although the pipeline had proposed no change in zone rate differentials for transportation costs, several parties pressed for an abolition of zones and the institution of an Mcf-mile method.[26] Without finding the old allocation method unlawful, the Commission ordered the Mcf-mileage method established. The District of Columbia Circuit vacated the Commission's decision, rejecting the Commission's argument that because the pipeline initiated the rate increase under § 4(d), the Commission did not have to follow § 5(a) procedures with respect to changes not requested. 642 F.2d at 1345–6. Because the pipeline had not requested a change in the method of allocating transportation costs, the District of Columbia Circuit held the Commission was required to find the old method unlawful before it could impose a new method.[27] That court noted, though, that had the pipeline proposed the changes, the Commission could have approved such changes under § 4(e) in whole or in part. 642 F.2d at 1345.

■ In the petition on review, Southern in its initial filing proposed to retain rate

opposed to the Commission, had to make a special showing justifying the retention of a long-used cost allocation methodology. We rejected that argument holding that just because a pipeline files a rate increase, it cannot be made to bear the burden of proof on the portions of the filing adhering to the status quo.

**25.** In the area of gas curtailment, the distinction between these two sections has been of particular significance. *See Public Service Commission v. FERC, supra,* for a brief history of gas curtailment cases. Anticipating difficulties in rapidly implementing curtailment plans in the early 1970's, the Commission ordered pipeline companies to file their own curtailment plans which could be implemented during shortages. If a shortage did develop, the Commission could accept the filing, suspend it or implement it immediately, and use it as a guide during hearings. *FPC v. Louisiana Power & Light Co.,* 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972). The Fifth Circuit once found a curtailment plan had in fact been dictated by the Commission. Because the Commission had not complied with the requirements of § 5(a), this circuit vacated the plan. *Louisiana v. FPC,* 503 F.2d 844, 860–62 (5th Cir. 1974). In *Sebring Utilities Commission v. FERC, supra,* we noted that courts should be sensitive to the possibility of curtailment plans

which the Commission has coerced without adherence to § 5(a) procedures.

**26.** The District of Columbia Circuit did not extensively describe the zone system and the Mcf-mileage system of allocating transportation costs discussed therein. Both systems had distance and volume elements. 642 F.2d at 1347, n.21. The parties there disagreed as to which system more accurately reflected distance-related costs. *Ibid.* at 1346.

**27.** The District of Columbia Circuit also gave a second rationale for its decision, namely, that the Commission failed to give a reasoned explanation for its deviation from the zone allocations it had approved for so long. *Ibid.* at 1346–1348.

As support for this second rationale, the *Public Service Commission* court relied on another recent rate case, *Columbia Gas Transmission Corp. v. FERC,* 628 F.2d 578 (D.C.Cir.1979), where the court found that the Commission had not adequately explained a departure from prior costing methodology. Mississippi Valley also claims that the Commission has deviated from long-standing past practice without explanation, a contention we reject below in Section IV.

zones modified to take account of the receipt of LNG. However, the proposal to eliminate zones in a phased-out process was also initiated by Southern. The fact that this proposal was the result of a settlement does not mean it was coerced. It remains a change requested by Southern pursuant to § 4(d) of the NGA. The Commission did not force the settlement, imposed no change of method on the settling parties, and the § 5(a) findings and burdens can in no way be imposed on the Commission. Accordingly, we reject Mississippi Valley's argument that the Commission had to first make a finding that Southern's existing zone system of allocating transmission costs was unlawful and had to bear the burden of demonstrating such a finding.[28]

### B. Substantial Evidence

■ In passing on Southern's proposed change, the Commission relied significantly on its finding that rate zones had become unfair, impractical, and unreasonable in approving Southern's proposal. In determining whether a proposed change is just and reasonable, a relevant consideration may be whether the existing rate is still just and reasonable. Mississippi Valley maintains there is no substantial evidence to support the Commission's conclusion that the rate zones were no longer fair, practical or reasonable. In making this argument, Mississippi Valley does not maintain that there is no evidence supporting the Commission's finding. Instead, it argues that the facts

supporting the retention of zones is so overwhelming as to render the finding unsupported by substantial evidence.

■ Mississippi Valley is correct that in applying the substantial evidence test the reviewing court must look to the entire record and "must take into account whatever in the record fairly detracts from" the finding. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332 (5th Cir. 1980). However, the substantial evidence test states that an agency's decision need not be supported by the weight of the evidence; the "possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). "[Substantial evidence is] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Refrigerated Transport Co. v. I.C.C.*, 616 F.2d 748, 751 (5th Cir. 1980) (citations omitted).

Mississippi Valley relies primarily on two factors in detracting from the Commission's conclusion. First, there was a greater percentage differential in miles of haul between Zone 1 and a combination of Zones 2 and 3 and after introduction of LNG, than existed between Zone 1 and 2 or between Zones 2 and 3 before introduction of LNG.[29]

CA 4482-1

**28.** The Commission made findings that Southern's rate zone method of allocation, modified to take account of the LNG, was no longer fair, practical or reasonable. The Commission extensively explained why it made these findings. Without so holding, we note that these findings are very similar to those required under § 5(a) proceedings.

**29.** Before the introduction of LNG, the percentage differentials in miles of haul between the zones was:

| | Demand Mcf/Miles | Commodity MMcf/Miles |
|---|---|---|
| Zone 1 | 197.11 | 211.97 |
| | (131%) | (114%) |
| Zone 2 | 454.42 | 453.26 |
| | (39%) | (39%) |
| Zone 3 | 631.57 | 629.02 |

After the introduction of LNG, the percentage differential in miles of haul between zones 1 and a combination of zones 2 and 3 was:

| | Demand Mcf/Miles | Commodity MMcf/Miles |
|---|---|---|
| Zone 1 | 197.11 | 211.97 |
| | (151%) | (122%) |
| Pipeline East of Zone 1 (Zones 2 and 3) | 494.43 | 469.60 |

Zones 2 and 3 were combined for the period after introduction of LNG because under the modified rate plan advocated by Mississippi Valley, the percentage differentials between these two zones was negligible. Mississippi Valley did not object to the combining of Zones 2 and 3 for the purpose of calculating zone differentials after the introduction of LNG.

Second, Zone 1's load factor [30] is 65.74%, which is higher than both Zone 2's load factor of 57.73% and the load factor of the pipeline as a whole which is 64.17%. Moreover, Zone 1's load density from 1963—when zoned rates were first approved for Southern's system—to the present has increased, while the load densities for Zones 2 and 3 have decreased from 1963 to the present.

We do not deny that these are facts supporting the retention of zones. Nor, from what we can tell from the record, does the Commission. Instead, the Commission balanced the facts for and against rate zones, and found those against to prevail. We believe there are sufficient relevant facts in the record such that a reasonable mind would accept as adequate the Commission's conclusion. *Refrigerated Transport Co. v. I.C.C., supra.*

Because Mississippi Valley will benefit from the introduction of LNG in that the system will become more reliable and flexible, it is fair to make it and Zone 1 customers, along with the customers in Zones 2 and 3, shoulder the burdens of a practicable and reasonable allocation of transportation costs necessitated by the introduction of LNG.[31] Had the LNG been shipped to the western end of Southern's line so that the retention of rate zones would have been practicable, the LNG purchase costs would have been higher and the system would not have been as flexible or reliable as it is with a source on the eastern terminus. (J.A. pp.

239–241). Moreover, the Commission reasonably concluded that the introduction of LNG and the resulting underutilization of Southern's mainline, decreased the importance of the distance factor and increased that of the volume factor. The conclusion that it is impractical to maintain zones is supported by the difficulty of determining which gas some Zone 3 customers are receiving with the reverse flow and the changing locations where western gas and LNG are blended. As a reviewing court, we are particularly ill-equipped to determine what difficulties may be encountered in the several determinations—*e. g.*, which gas is received by a customer, or what percentage of blends of gas are received by a customer—necessary to implement the modified method of allocation of transportation costs favored by Mississippi Valley. Finally, the conclusion that zones are no longer reasonable is supported by the fact that Zone 1 receives only approximately 10% of Southern's volume of gas. Zones 2 and 3, between which the mileage of haul differentials are negligible after LNG, receive 90%. The reduction in the percentage of customers for whom zone differentials are relevant is significant. Moreover, some Zone 3 customers, served almost exclusively by LNG, are located closer to the LNG station in Savannah than Mississippi is to the supply fields to the west. To charge these customers the Zone 3 rate, the highest on the system, is manifestly unfair when they are closer to their source of gas than Mississippi Valley is to its source of gas.

30. The load factor is the average daily requirement of gas within a zone divided by the maximum daily requirement within that zone, expressed as a percentage. *See Columbia Gas Transmission Corp. v. FERC*, 628 F.2d at 584 n.19; *Lynchburg Gas Co. v. F.P.C.*, 336 F.2d 942, 944 n. 1 (D.C.Cir.1964). A high load factor is an indication of a relatively stable demand for gas, while a low load factor indicates a widely fluctuating demand for gas. *Columbia Gas Transmission Corp. v. FERC, supra.* A high load factor indicates a more efficient use of the capital plant without as much unused capacity in nonpeak demand periods as with a low load factor. Mississippi Valley is arguing that because its load factor is higher than that of Zone 2 and the system, the extra capacity in Southern's pipeline and the additional cost of

such extra capacity is the result of the other Zones' demand. Accordingly, it maintains the mileage based allocation method should be retained to allocate a larger portion of transportation cost to those zones.

31. Mississippi Valley claims that because the Commission had justified rolling in the purchase costs of LNG to Southern's system on the benefits of increased supply, reliability, and flexibility, *Columbia LNG Corp., et al.*, 11 Fed. Power Serv. 5–325 (1977), use of these claimed benefits to justify elimination of rate zones amounts to double payment of these benefits. We are unfamiliar with any economic theory which quantifies the value of such benefits or limits them to only one item of cost.

Mississippi Valley suggested in its presentation that this problem could be remedied with the creation of a fourth zone. The Commission found this suggestion unreasonable. The conclusion that a fourth zone is unreasonable is supported by the fact that the Zone 3 customers served almost exclusively by LNG, nevertheless, will receive western gas on peak demand days. Mississippi Valley does not believe these are sufficient reasons to eliminate zones or to refuse to create a zone. Within any zone, some customers will subsidize the transmission costs of other customers within the same zone. Mississippi Valley argues that this inevitable subsidy means the Commission's concerns are irrational. This contention only illustrates the difficulty in establishing appropriate zones for allocation of costs. No zone system will perfectly allocate costs to each customer. This is one reason courts defer to the expertise of the Commission in establishing rates. On this matter, we also defer to the Commission.

Viewing the evidence as a whole, we conclude the Commission's findings are supported by substantial evidence, despite the fact that Mississippi Valley does point to evidence in the record supporting the retention of zones.

## C. Compliance with Prior Commission Precedent.

■ An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent. *Secretary of Agriculture v. United States*, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); *Central Power & Light Co. v.*

*United States*, 634 F.2d 137 (5th Cir. 1980), *U. S. appeal pending; Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578 (D.C. Cir.1979). Mississippi Valley complains that the Commission has departed from its own precedent without making adequate explanation. Mississippi Valley believes that the Commission has deviated from its holdings in *Northern Natural Gas Co., supra, Tennessee Gas Transmission Co.*, 27 F.P.C. 202 (1962), and *Southern Natural Gas Co., supra*, the opinion initially establishing Southern's rate zones.

■ In these three prior Commission decisions, Mississippi Valley perceives a rule that transportation costs should be allocated according to distance when load factors and load densities between zones are approximately equal. Mississippi Valley is correct in asserting that these cases have language indicating that distance is of prime importance when load density and load factor between zones are approximately equal.[32] However, all these cases involved pipelines receiving gas at one terminus.[33] In approving Stipulation III, the Commission emphasized that a significant change in Southern's system was the introduction of gas at the eastern terminus of its line. This was a factor not present in the three prior Commission decisions relied upon by Southern. The Commission explained in detail why the introduction of LNG on the eastern terminus made a rate zone allocation unfair, impractical, and unreasonable. Rather than an unreasoned departure from prior precedent, the Commission's decision was a reasoned explanation as to why a new factor made reasonable a

32. *Tennessee Gas Transmission Co., supra*, states:

Of the three factors [distance, load factor, load density] to be considered, distance of transmission has the most constant and predictable relation to cost. Thus, where the zones of a pipeline system have no extreme variations in load factor or load density, the distance factor can ... be applied [by the Mcf-mile method].

27 F.P.C. at 209.

*Northern Natural Gas Co., supra*, states:

[U]nless other circumstances are present which outweigh the importance of length of transmission required to effect delivery, the distance factor is the prime determinate of the cost of rendering service.

14 F.P.C. at 24.

33. The pipeline in *Tennessee Gas Transmission Co., supra*, had a storage facility in Pennsylvania, approximately three-fourths downstream on its line. 27 F.P.C. at 223–4. Gas was not received at this point, but was stored during nonpeak demand periods.

new systemwide allocation of transportation costs.

#### D. Comparison with *Michigan-Wisconsin Pipe Line Co.*

The Commission found that after introduction of LNG, Southern's system resembled Michigan-Wisconsin Pipe Line Company's system. In reviewing that company's system in *Michigan-Wisconsin Pipe Line Co.*, 34 F.P.C. 621 (1965), the Commission found that the systemwide method of allocating transmission costs was not unreasonable or discriminatory.[34] The pipeline in *Michigan-Wisconsin* is shaped like a "Y" with one arm of the "Y" extending into Michigan and the other arm of the "Y" into Wisconsin. The similarities noted by the Commission were that on both pipelines, gas from the primary supply source flowed through the entire system and was physically received by all customers. Gas received from the downstream end in both systems, however, does not physically reach all upstream customers. Nevertheless, on both systems, all customers benefit from the additional volumes of gas introduced downstream because of the increased flexibility and reliability of the system.

Mississippi Valley points to differences between the two systems which it claims makes the Commission's comparison arbitrary and unreasonable.[35] We find none of these differences compelling. We defer to the expertise of the Commission. The Commission's finding of similarity falls well within the scope of those judgments presumed valid.

#### E. Reliability of LNG.

Mississippi Valley also maintains the decision to permit the institution of a systemwide allocation method is unreasonable in light of the unreliability of LNG. Between the Commission's opinion No. 83, and its opinion on rehearing, Algeria cut off LNG deliveries to Southern on April 1, 1980. The Commission concluded that this cutoff did not require abandonment of the systemwide method of cost allocation since at that time sufficient volumes of LNG remained available to Southern in storage to continue deliveries through the 1980–81 winter. The Commission expressly stated this issue could be reconsidered in the future if Southern Energy had to abandon its LNG facilities. This was a fair and just resolution of this problem, and Mississippi Valley's argument on this point is rejected.[36]

#### F. Illegal Preference.

Florida Gas is a customer located in Southern's Zone 1. Florida Gas also purchases from Southern transportation of its own gas. The Commission's order provided that Southern could charge for transportation of Florida Gas' own gas by mileage. The Commission adopted the ALJ's reason-

---

**34.** The question of whether to convert the pipeline's systemwide method of allocation of transmission costs to a rate zone system was treated by the Commission in *Michigan-Wisconsin* as a § 5(a) proceeding since the pipeline there wished to retain the systemwide method. The Commission found that the proponents of the zone-rate system had not proven the systemwide to be unreasonable or discriminatory.

**35.** The differences emphasized by Mississippi Valley are:
(1) Southern's system is essentially lineal while Michigan-Wisconsin's is "Y-shaped"; (2) Michigan-Wisconsin's system is a grid, receiving gas at many points in the arms of the "Y"; (3) the load factor in Michigan-Wisconsin's initial zone closest to the primary source is only 38%,

substantially below the 54% systemwide load factor, while Southern's zone 1 load factor is 65.74%, higher than the 64.17% systemwide load factor; (4) during peak demand periods, Michigan-Wisconsin's reverse flow goes from the Michigan arm of the "Y" into the Wisconsin arm of the "Y" while Southern's reverse flow is lineal; and (5) Michigan-Wisconsin had storage in the Michigan arm of the "Y" while Southern's test period storage is in zone 1.

**36.** Mississippi Valley informs this court that the cutoff of LNG continues. Because we must review the Commission's decision on the basis of the record before it, and not on the basis of facts occurring after its decision, we do not consider this allegation.

ing that there was no reason to require Florida Gas to pay for transportation by volume since with this service, it did not receive the benefits of LNG. Charging for transportation only by mileage was found to be reasonably related to the service rendered. Mississippi Valley argues that the differential in rates between Florida Gas and Zone 1 customers is an undue preference under § 4(b) of the NGA. The rate differential between transportation only and transportation of purchased gas, however, is not undue and is reasonably related to differences in services rendered.

### G. Due Process Violation.

Mississippi Valley claims that its due process rights were violated by the terms of the Stipulation III, providing that should the Commission not adopt the settlement or adopt it with modifications unacceptable to the parties, the parties would be entitled to introduce evidence in support of their original positions. Mississippi Valley argues that this was a ploy by one group of litigants aligned against its interests, attempting to force the Commission to adopt Stipulation III to avoid future hearings. The Commission on rehearing indicated it was not thus influenced and we have no reason to question the Commission's statement on the matter. Also, because the Commission adopted Stipulation III in whole, Mississippi Valley has suffered no harm.

Mississippi Valley also maintains that Stipulation III violates the Commission's Regulation 1.18(e), 18 C.F.R. § 1.18(e) (1980), in that stipulation III could not have been accepted without a waiver of rights to future, additional hearings. Mississippi Valley misreads this regulation. It does not contain a provision requiring waiver of rights to introduce evidence in the future should a settlement be rejected. It also is not applicable to stipulation III since it applies only to offers of settlement filed on or after June 15, 1979.

### H. Allocation of Miscellaneous Costs.

In *Southern Natural Gas Co., supra*, the Commission provided that administrative and general costs connected with transmitting gas and money paid by Southern to others for transmitting and compressing gas should be allocated on a mileage basis. 51 F.P.C. at 345–349. The Commission did not single out the administrative and general costs for special treatment. The Commission did provide that the costs for transmitting and compressing gas purchased from others should be correlated with Southern's mileage method of allocation by imputing a mileage factor to the gas purchased from others at the point Southern took delivery. 51 F.P.C. at 346–347. Mississippi Valley maintains that these costs should continue to be allocated on a mileage factor. The only reason offered by Mississippi Valley's witness to support this conclusion was his perception that the introduction of LNG had wrought no substantial change in Southern's system. (J.A., p. 32). Insofar as the Commission concluded sufficient change had occurred to justify the elimination of the mileage factor, the rationale for allocating these particular costs has disappeared. The Commission acted reasonably in allowing the termination of mileage allocation of these costs.

### V. CONCLUSION

In both petitions for review, we have found no fault with the Commission's decision requiring action by this court. The decisions in both petitions are therefore AFFIRMED.