**NEW ORLEANS PUBLIC SERVICE, INC., Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 79–3788, 79–3789.

United States Court of Appeals, Fifth Circuit.*

Oct. 15, 1981.

---

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

**510**

Clayton L. Orn, Anderson, Brown, Orn & Jones, Houston, Tex., William C. Nelson, Gen. Counsel, New Orleans, La., for New Orleans Public Service, Inc.

Thomas W. Pounds, Elizabeth Wade, Irving Jacob Golub, Baker & Botts, Houston, Tex., for United Gas Pipe Line Co.

William T. Miller, Miller, Balis & O'Neil, Washington, D. C., for United Municipal Distributors Group.

Christopher T. Boland, John F. Harrington, Washington, D. C., for Texas Gas Transmission Corp.

John B. Rudolph, Washington, D. C., James H. Wuller, St. Louis, Mo., for Mississippi River Transmission Corp.

Jerome Nelson, Sol., Barbara Weller, Jane Murphy, Washington, D. C., for Federal Energy Regulatory Com'n.

Before HENDERSON, ANDERSON and SAM D. JOHNSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

The parties in this case are petitioner New Orleans Public Service, Inc. ("NOPSI"), intervenors United Gas Pipe Company ("United") and Mississippi River Transportation Corporation ("MRTC") and respondent Federal Energy Regulatory Commission ("FERC"). NOPSI is a public utility supplying electric energy, natural gas and transit services in New Orleans, Louisiana.

As the purchaser of 41% of the natural gas sold in United's southern zone, NOPSI is United's largest southern zone customer. United is an interstate gas pipeline company regulated by the FERC pursuant to the Natural Gas Act, 15 U.S.C.A. § 717, *et seq.* (West 1976). United has a pipeline system in Texas, Louisiana, Mississippi, Alabama and Florida with two rate zones, northern and southern. It is NOPSI's principal supplier of natural gas. MRTC, a natural gas company, is a customer of United. The FERC is the successor agency to the Federal Power Commission ("FPC") charged, among other things, with responsibility for "the establishment, review, and enforcement of rates and charges for the transportation and sale of natural gas by a producer or gatherer or by a natural gas pipeline or natural gas company under §§ 1, 4, 5 and 6 of the Natural Gas Act." 42 U.S.C.A. § 7172(a)(1)(C) (West Supp. 1980).

Two contested settlements are involved in this consolidated appeal. The first settlement involved a series of seven proceedings [1] covering rate filings by United which became effective on different dates from June 1, 1971, to October 9, 1976. The first settlement was approved by Commission Opinion No. 52 issued July 31, 1979. We refer to the proceedings involved in the first settlement as the first proceeding. The second settlement, approved by Commission order issued July 30, 1979, involved a single proceeding, FERC Docket No. RP77–107, for a "locked-in" [2] period from January 1, 1978, to December 1, 1978. We refer to the second settlement as the second proceeding. In this appeal, NOPSI seeks

review of the FPC orders approving these two contested settlements. We affirm FERC and enforce its orders.

NOPSI argues that the FERC erred in accepting the settlement agreements because the administrative settlement procedures followed were inappropriate; that FERC's findings with respect to each case are not supported by substantial evidence; and that the FERC erred in approving settlements which reflected continued use of the United [3] methodology of cost classification and allocation. We address each argument in turn.

## I. ADMINISTRATIVE SETTLEMENT PROCEDURES

NOPSI argues that the Commission erred in accepting the contested settlement in the first proceeding because no evidentiary hearing was held in connection with that proceeding. FERC may adopt a contested settlement only if it finds by substantial evidence on the record as a whole that the agreement will establish just and reasonable rates, NOPSI argues. An evidentiary hearing is necessary for the Commission to make such findings, according to NOPSI, and the hearing held in connection with the settlement proposal for the second proceeding is not sufficient to comply with the hearing requirement with respect to the first proceeding. We reject NOPSI's argument.

It is well settled that the Commission [4] can approve contested settlements as long as it determines that the proposal will

---

1. The seven proceedings are FERC Docket Nos. RP71–41; RP72–75; RP74–20; RP74–83; RP75–30; RP75–109; RP76–84.

2. A "locked-in" rate is an increased rate which is later superseded by a further rate increase. The validity of the first increase thus relates only to a limited intervening period called the "locked-in" period. The possible refund obligation, if the rate is found unlawful, is the only issue in the § 4(e) [15 U.S.C.A. § 717c(e) (West 1976)] proceedings. *See Permian Basin Area Rate Cases*, 390 U.S. 747, 827 n.118, 88 S.Ct. 1344, 1391, 20 L.Ed.2d 312 (1968); *Wisconsin v. FPC*, 373 U.S. 294, 298 n.5, 83 S.Ct. 1266, 1269, 10 L.Ed.2d 357 (1963).

3. The *United* methodology of cost classification and allocation, discussed at length in the text, *infra*, was adopted by the Federal Power Commission, the FERC's predecessor agency, in Opinion No. 671, 50 F.P.C. 1348 (1973), and affirmed by the Court of Appeals for the District of Columbia Circuit in *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176 (D.C. Cir. 1975).

4. We use the term "Commission" to refer to both the Federal Power Commission and the Federal Energy Regulatory Commission.

establish just and reasonable rates. *Placid Oil Co. v. FPC*, 483 F.2d 880, 893 (5th Cir. 1973), *aff'd. sub nom. Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312–13, 94 S.Ct. 2328, 2347–48, 41 L.Ed.2d 72 (1974). Moreover, it is clear that in some circumstances the Commission can approve contested settlements without conducting a formal evidentiary hearing. *Pennsylvania Gas & Water Co. v. FPC*, 463 F.2d 1242 (D.C. Cir. 1972). We must determine whether the contested settlement proposal in this case comes within the boundaries of *Pennsylvania Gas.*

In *Pennsylvania Gas & Water Co. v. FPC*, 463 F.2d 1242 (D.C. Cir. 1972), petitioner Pennsylvania Gas claimed due process violations because of the settlement of rate proceedings without a hearing and over its objections. The court of appeals held that approval of the contested settlement by the FPC was proper though no formal evidentiary hearing was held because there was no dispute of fact. The court said, "In the case at bar, we find no possible dispute over the facts since the Commission accepted all of Penn Gas' *factual* allegations as correct." 463 F.2d at 1251. Furthermore, the court noted, the petitioner had had the opportunity to present its position to the Commission. It said, "Penn Gas has been afforded ample opportunity to present its position to the Commission from its participation in both the prehearing and informal conferences, its objections to the proposed 'Stipulation and Agreement' filed with the Commission, and its objections to the FPC's first order in its application for rehearing." 463 F.2d at 1251. The evidence reviewed by the FPC in deciding that a further hearing was not warranted included the testimony and exhibits filed by petitioner Pennsylvania Gas, petitioner's objections to the motion for approval of the "Stipulation and Agreement" and for termination of the proceedings, an answer in opposition to the Commission staff's response to its objections to the settlement agreement, and an application for rehearing further specifying its objections. 463 F.2d 1242 at 1245, n.11. The court explained that approval of a contested settlement is like the granting of a motion for summary judgment when there exist no genuine issues of material fact. It said:

[I]n agency proceedings settlements are frequently suggested by some, but not necessarily all, of the parties; if on examination they are found equitable by the regulatory agency, then the terms of the settlement form the substance of an order binding on all the parties, even though not all are in accord as to the result. This is in effect a "summary judgment" granted on "motion" by the litigants where there is no issue of fact.

463 F.2d at 1246.

It is clear from the record that the Administrative Law Judge carefully considered NOPSI's request for an evidentiary hearing in connection with the settlement in the first proceeding and expressly denied that request. J.A. at 316, et seq. Affirming the ALJ's decision, the Commission found that there was no need for a hearing because "[a] full evidentiary hearing has since taken place in United's subsequent rate increase proceeding, Docket No. RP77–107 .... The same parties and the same issues involved there are present in this case before us now." J.A. at 239 (Opinion and Order Approving Settlement Agreement in RP71–41, et al. at 10). Further explaining its rejection of NOPSI's request for a hearing, the Commission stated, "In this case, we have examined each of NOPSI's material objections and have concluded that its arguments either have no merit on their face or raise questions on subjects which have been determined previously as matters of policy generally applicable in all cases raising like issues and not requiring further hearing. Also, in light of the full hearings which took place in Docket No. RP77–107 on the issue of the allocation of charges by other pipe lines for transporting United's gas, we have no doubt that NOPSI has not been deprived of procedural due process." *Id.* at J.A. 275. The Commission found further that the decision in *Pennsylvania Gas & Water Co. v. FPC, supra*, supported its denial of a hearing and that NOPSI's opportunity to present its arguments through participation in the settlement conference and by filing comments

with the Commission satisfied due process and statutory requirements.[5] The Commission specifically found that "NOPSI's objections to the settlement agreement do not involve an issue of material fact." *Id.* at J.A. 281.

■ We find no error in the Commission's determination that NOPSI has not raised an issue of material fact which required a hearing in the first proceeding in addition to the hearing previously held in connection with the second proceeding. We therefore hold that the Commission's approval of the settlement agreement in the first proceeding, without conducting a formal evidentiary hearing specifically in connection with that proceeding, was proper.

It is clear that NOPSI had an opportunity to present to the Commission NOPSI's opposition specifically directed to the settlement proposal in the first proceeding. It did so by filing a brief and testimony in opposition to the settlement agreement in the first proceeding (J.A. at 414–472), by filing comments opposing the settlement agreement (J.A. at 473–491), and by participating in settlement conferences in connection with that proceeding.

NOPSI claims, nevertheless, that factual disputes do exist thereby entitling NOPSI to an evidentiary hearing in connection with the settlement proposal in the first proceeding. NOPSI urges first that NOPSI consultant, Henry C. Owen, Jr., would have raised factual disagreements had he been able to testify during a hearing. Nopsi Reply Brief at 12. Next NOPSI argues that FERC staff witnesses, had they had the opportunity to testify at a hearing, would have raised fact disputes regarding cost of service, rate base, advance payments and rate of return in connection with the settlement of RP75–109, part of the first

proceeding. *Id.* at 11. Finally, NOPSI argues that there was a factual dispute regarding the use of the cost allocation method. *Id.* at 11.

We remain unconvinced that there is any real substance to NOPSI's claim of the existence of material factual disputes which warrant a hearing beyond those issues addressed in the hearing in connection with the second proceeding. We consider each alleged factual dispute in turn.

With respect to Owen's testimony, NOPSI has not shown what specific disputes of fact Owen would have raised in his testimony.[6] Nor has NOPSI shown how such disputes would be material. Accordingly, we are not persuaded that a hearing was necessary to allow Owen to testify.

With respect to alleged factual disputes regarding cost of service, rate base, advance payments and rate of return, we note initially that the ALJ certified to the Commission the exhibits which contained the staff testimony. J.A. at 354–5. Thus, the Commission had the benefit of the staff testimony when it evaluated the justness and reasonableness of the settlement proposal. The fact that the testimony in question presented differing figures for cost of service, rate base, advance payments and rate of return from the settlement figures for each category does not mean that a hearing was required to address those differences. Once again, NOPSI has failed to demonstrate that these differences in figures raise genuine issues of material fact. Our review of the transcript of the hearing before the Administrative Law Judge, at which NOPSI argued in favor of an evidentiary hearing (J.A. at 316–358), and our examination of the brief and testimony of New Orleans Public Service Commission In Opposition To Settlement Agreement (J.A. at 447–451)

**5.** The Commission cited 1 K. Davis, *Administrative Law Treatise*, §§ 7.01–.04, 7.07 (1958).

**6.** Elsewhere in its brief, NOPSI describes a prepared statement by Owen which allegedly shows why the settlement rates are not just and reasonable. NOPSI Brief at 29–33. This statement is discussed in Part II.A.7, of this opinion, *infra*. To the extent that this state-

ment can be said to raise disputed issues, we believe that it shows that there is dispute about the conclusions to be drawn from basic facts. This dispute involves questions of policy and does not indicate a conflict in fundamental facts. Consequently, it does not necessitate a hearing. *See Pennsylvania Gas & Water Co. v. FPC*, 463 F.2d at 1252.

suggest to us that the differences in figures reflect disagreement in matters of policy rather than conflict in basic facts. Moreover, the testimony which NOPSI argues would create factual disputes warranting a hearing is not testimony of NOPSI's own witnesses but is, instead, testimony of FERC staff which was not addressed to the settlement proposal but was addressed to an earlier stage of the proceeding. J.A. at 353. In connection with his decision to certify the exhibits in question, the ALJ commented:

Now, with respect to the Staff's position, certainly the Staff is free to change its position, to express a different view from that which is contained in the testimony they filed, in view of the overall settlement that is proposed; and certainly they will have the opportunity to do that in their comments.

J.A. at 354. Staff did change its position because it in fact supported approval of the settlement agreement although it recommended certain modifications which the settlement reserved for future determination and therefore which are not at issue here. We conclude that there is no merit to NOPSI's claim that there are factual disputes requiring a hearing before approval of the settlement proposal would be proper.

We are left with the impression that NOPSI's primary objection relates to the Commission's refusal to hold a separate hearing in the first proceeding to consider the cost allocation method issue. We are convinced, however, that such a hearing was not required. The cost allocation issue, the merits of which are fully discussed in a later part of this opinion, was clearly addressed in a hearing held in connection with the second proceeding prior to the Commission's approval of the settlement in the first proceeding.[7] The Commission thus had the hearing evidence before it when it determined to approve the settlement proposal in the first proceeding. On pages 25–26 of the Opinion and Order Approving Settlement Agreement in the first proceeding, the Commission stated:

It is true that no formal hearing has taken place in Docket Nos. RP71–41, et al., [i. e., the first proceeding] on the issues raised by NOPSI. Nevertheless the same parties dealt with the same issues in United's next subsequent rate filing, Docket No. RP77–107 [the second proceeding]. A full hearing with cross-examination took place in that case. A complete record exists. Examination of the relevant pleadings indicates there is no basis to distinguish the assertions advanced in Docket No. RP77–107 from those in Docket No. RP71–41, et al. and no reason to believe that our findings in Docket No. RP77–107, wherein we have concluded that NOPSI's objectives in that case should be denied should not be applied in all respects in our decision in these proceedings. Thus to provide NOPSI a further hearing on this same issue would yield no additional insight into the matter. It would be an empty exercise of the Commission's administrative efforts. Accordingly, we adopt those conclusions in our decision in Docket No. RP77–107 which are relevant to the matters involved in Docket Nos. RP71–41, et al.

J.A., p. 254–55. The parties to the proceedings were the same. The proper method of cost allocation and the question of the impact on United System that would occur from a change in the cost allocation method were at issue in both proceedings. We see no reason to disturb the Commission's determination that the hearing in connection with No. RP77–107 (the second proceeding) concerned the same issues and the same parties involved in RP71–41, et al. (the first proceeding). We conclude that any hearing requirement in connection with the cost al-

---

7. The hearing in connection with the second proceeding, at which the cost allocation issue was addressed, was held on December 12, 1978. The Commission approved the settlement proposal in the first proceeding on July 31, 1979. See excerpt from hearing held December 12, 1978, J.A. at 1–16; testimony of Henry C. Owen, Jr., J.A. at 17–41; testimony of William Prather, J.A. at 42–64. We note that the Commission gave thorough and extensive treatment to the cost classification and allocation issue in its Order Approving the Settlement Agreement in No. RP77–107, the second proceeding. J.A. at 125–128.

location issue in the first proceeding was met by the hearing in the second proceeding.

In sum, there was no necessity for an evidentiary hearing in connection with the first proceeding because (1) NOPSI had the opportunity to present its opposition to the settlement proposal in the first proceeding through its participation in the settlement conferences, and its participation in the hearing in the second proceeding which covered the same cost allocation issue involved in the first proceeding; (2) because there were no other genuine factual disputes created by NOPSI's testimony; and (3) because the Commission addressed NOPSI's objections to the settlement proposal.[8] *See Pennsylvania Gas & Water Co. v. FPC*, 463 F.2d 1242 (D.C. Cir. 1972); *Citizens for Allegan County, Inc. v. FPC*, 414 F.2d 1125 (D.C. Cir. 1969). Moreover, the Commission's decision not to hold a second duplicative evidentiary hearing is consistent with its authority to tailor administrative procedures to the needs of the particular case. *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 544, 98 S.Ct. 1197, 1212, 55 L.Ed.2d 460 (1978) (where the Court spoke of "the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure."); *Superior Oil Co. v. FERC*, 563 F.2d 191 (5th Cir. 1977). We conclude that the Commission's refusal to hold a hearing in connection with the first proceeding was proper.

## II. SUBSTANTIALITY OF THE EVIDENCE

### A. First Proceeding.

NOPSI argues next that the proposed evidence in the first proceeding does not support the settlement. NOPSI makes several specific allegations relating to this argument which reduce to the following: (1) the settlement does not resolve all issues; (2) the seven separate proceedings were never consolidated; (3) certain settlement twelve-month test periods were not the same as those in the rate filings; (4) some of the proposed settlement rates were higher than the filed rates; (5) FERC staff's "top sheets" indicating a position inconsistent with the settlement were improperly excluded from evidence; (6) FERC staff controverted some of United's testimony; and (7) proposed testimony showed the settlement to be unjust and unreasonable.

Our power of review is found in § 19(b) of the Natural Gas Act, 15 U.S.C.A. § 717r(b) (West 1976). The court's reviewing function in a rate case, is to

> determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. Second, the court must examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Third, the court must determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interest, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to insure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purposes for which, it has chosen to act, as well as its assessment of the consequences of its orders for the character and future development of the industry.

*Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968). *Accord, Public Service Commission v. FERC*, 642 F.2d 1335 (D.C.

---

**8.** *See* Opinion and Order Approving Settlement Agreement, pp. 25–29, J.A. at 254–58.

Cir. 1980), *U.S. appeal pending; Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578 (D.C. Cir. 1979).

We consider each of the specific challenges listed above to determine whether the Commission abused or exceeded its authority with respect to the particular issue, and whether the Commission's decision is supported by substantial evidence.

### 1. Unresolved Issues.

■ We reject NOPSI's contention that the settlement should not have been approved because it leaves much unsettled. We do not think the Commission is under any duty to approve only those settlement agreements which include resolution of all issues. The Commission has the authority to approve partial settlements. *Cities of Lexington, Kentucky, Etc. v. FPC*, 295 F.2d 109, 121 (4th Cir. 1961).

### 2. Consolidation.

■ We cannot see how the fact that the seven different cases encompassed within the first proceeding were never formally consolidated by the Commission has any bearing on the justness and reasonableness of the settlement here. Moreover, NOPSI has not shown how it was prejudiced by the absence of consolidation. We view the decision whether or not to consolidate cases as a matter solely within the discretion of the Commission. *City of San Antonio v. CAB*, 374 F.2d 326 (D.C. Cir. 1967).

### 3. Test Periods.

■ NOPSI's argument that the settlement must use the same twelve-month test period used in the rate filing for measuring the cost of service, rate base, capitalization and gas volumes is without merit. To the contrary, we hold that it was proper to use more current data than that provided in the original filing for purposes of arriving at a settlement. Neither *Consolidated Gas Supply Corp.*, 52 F.P.C. 454 (1974), nor 18 C.F.R. § 154.63(e)(2) (1980), cited by appellant in support of its argument, prohibits updating of data for settlement purposes.

### 4. Higher Settlement Rates.

■ We find no merit in NOPSI's argument that § 5(a) of the Natural Gas Act, 15 U.S.C.A. § 717d(a)[9] was violated by the Commission's approval of the settlement here. The fact that the demand component[10] of the rate in certain dockets was higher in the settlement than it was in the rate filing does not mean that the Commission could not find the settlement just and reasonable. FERC, United and MRTC all point out, and NOPSI does not dispute, that although the settlement resulted in an increase in certain demand charges to NOPSI, the total charge to NOPSI pursuant to the combined rate is lower. The Commission specifically addressed, and rejected, NOPSI's objection to the increase in demand charges (J.A. at 268–272). The Commission explained the reason for the settlement's increase in the southern zone demand charge. The increase was caused both by

---

9. 15 U.S.C.A. § 717d(a) (West 1976) reads:

(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however,* That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates.

10. As will be explained more fully in a later section of this opinion, the rate in question is a combined rate, made up of a demand component and a commodity component.

classification of transportation costs and by the fact that "total costs associated with the transportation and compression of gas by others rose substantially above the costs for this item which were contained in United's original filings." J.A. at 271. The Commission's approval of the settlement rates in Commission Docket Nos. 76–84 and 75–109, part of the first proceeding, was within its authority.

### 5. Top Sheets.

■ Next we consider NOPSI's argument that FERC staff's "top sheets" in Commission Docket No. RP76–84 (part of the first proceeding), which NOPSI alleges refuted United's proposed evidence, were improperly excluded from evidence by the Administrative Law Judge. Upon objection of counsel for United and FERC staff, the exhibit in question, "Top Sheet, Staff Cost of Service, United Gas Pipe Line Company," dated March 18, 1977, was excluded from evidence. Speaking of the exhibit, the ALJ said: "I think it must be treated as an offer of settlement. As such, under the Commission's rules, it is privileged and should not be used as evidence, whether in support of a settlement or in opposition to a settlement." J.A. at 341. We agree with the ALJ's exclusion of staff's top sheet. In Administrative Order No. 157, 41 Fed.Reg. 15090 (1976), the Federal Power Commission promulgated its "Top Sheet Procedures in Natural Gas Pipeline and Public Utility." There, the Commission defined top sheets as "summary cost of service schedules prepared by staff or intervenors on the basis of a detailed cost of service analysis for rate-making purposes." The Order indicates the procedure for preparation and use of the top sheets: "(1) The staff shall conduct its investigations and prepare top sheets summarizing its comprehensive studies in order to facilitate prompt settlement discussions. Issues not settled shall be set for later hearing." *Id.* 18 C.F.R. § 1.18(3) (1977), in effect at the time of the ALJ's exclusion of the top sheets, reads:

(e) *Offers of Settlement.*

Nothing contained in this section shall be construed as precluding any party to a proceeding from submitting at any time offers of settlement or proposals of adjustment to all parties and to the Commission (or to staff counsel for transmittal to the Commission), or from requesting conferences for such purpose. Unaccepted proposals of settlement or of adjustment or as to procedure to be followed and proposed stipulations not agreed to shall be privileged and shall not be admissible in evidence against any counsel or person claiming such privilege.

The ALJ's decision to exclude staff's top sheet from evidence on the ground that it was a privileged settlement document was correct.

### 6. Staff's Evidence Controverting United's Testimony.

■ NOPSI's next argument is that staff witnesses controverted United's filed testimony in Commission Docket No. RP75–109, part of the first proceeding. We remain unconvinced that any such disagreement means the Commission could not find the settlement just and reasonable. At settlement, the Commission is certainly not bound to adhere to a position advanced by its staff in a stage of the proceeding prior to settlement. We note again that staff recommended approval of the settlement; thus the staff saw no significant inconsistency between the staff testimony and the settlement. Nor do we. See Part I, *infra.*

### 7. Evidence Showing the Settlement Unjust and Unreasonable.

■ NOPSI argues that the proposed testimony of both United itself as well as that of NOPSI's witness, Henry C. Owen, Jr., demonstrate that the settlement rates are unjust, unreasonable and unduly discriminatory. NOPSI's arguments in this section can be summarized rather briefly. NOPSI's basic complaint is that, compared with the filed rates, the settlement rates have a discriminatory effect on United's southern zone customers, such as NOPSI. NOPSI argues that the settlement's relatively greater increase in certain demand charges to southern zone customers (as compared

with the demand component charges to northern zone customers) and the settlement's relatively smaller decrease in revenues from southern zone customers (as compared with northern zone customers) are discriminatory. NOPSI also argues that the use of the as-billed method[11] for classification of third-party transportation costs discriminates against NOPSI because it puts a greater emphasis on demand charges and the burden of the demand component charges falls more heavily on southern zone customers, such as NOPSI, than it does on northern zone customers.

The Commission addressed NOPSI's objection to the fact that certain southern zone demand charges in the settlement represented increases over the corresponding filed rates. J.A. at 268–272. The Commission explained that these increases in southern zone demand charges arose not only from the as-billed classification of third-party transportation costs but also from an increase in total costs of transporting and compressing gas by others which occurred after the original filings. J.A. at 271. We will not disturb the Commission's determinations with respect to these issues. We think that the disparities which NOPSI calls discrimination are, in reality, reflections of the fact that the approved cost methodology affects different types of customers differently. This difference in turn stems from the assumption built into the

methodology that different customers have different responsibilities for costs. *See Pennsylvania Gas & Water Co. v. FPC,* 463 F.2d 1242, 1252–54 (D.C. Cir. 1972); *Michigan Consolidated Gas Co. v. FPC,* 203 F.2d 895, 901 (3d Cir. 1953). NOPSI's objections to the continued use of the *United* methodology and its allegedly adverse impact on southern zone customers will be discussed in Part III, *infra.*

We are not persuaded by NOPSI's objection to the use of the as-billed methodology for recovery of third-party transportation costs. The Commission considered and rejected NOPSI's objection to the as-billed method of classifying third-party transportation costs. J.A. at 269–70; 272. The Commission explained that it has a consistent policy of classifying such charges on an as-billed basis. J.A. at 272. We will defer to the Commission's determination.

In summary, we reject each of NOPSI's several arguments to the effect that the settlement in the first proceeding was not just and reasonable. We hold that the Commission acted within its authority in approving the settlement and that its determination is supported by substantial evidence.

### B. Second Proceeding.

We move next to NOPSI's assertion that the settlement in the second proceeding is

---

11. Aside from the as-billed exception, the settlement approved the *United* method of cost allocation, which is discussed more fully in Part III of this opinion. *See also* note 3, *supra.* The *United* method is a two-part rate, including a demand component and a commodity component. Twenty-five percent of fixed costs, such as investment in pipeline facilities, taxes and depreciation, is recovered through the demand component. The remaining seventy-five percent of fixed costs and all variable costs, such as the gas itself and the cost of compression station fuel, are recovered through the commodity component. However, the settlement approved the "as-billed" method of cost allocation with respect to the cost of transportation and compression of United's gas by third parties. This means that United assigns 100% of the transporting pipeline's demand charges to United's own demand component and 100% of the other pipeline's commodity charges to United's commodity component. In other words, those charges classified as "demand" by the

transporter in its rates to its own customers are classified as "demand" charges by United and those charges classified as "commodity" by the transporter are classified by United as "commodity." While NOPSI objects to use of the *United* methodology of allocating its various fixed costs of service, 25% to demand and 75% to commodity, its argument here apparently is that, in arriving at appropriate rates for United, the Commission, having approved use of the *United* 25–75 methodology in the settlement, should require that this methodology be used with respect to allocating all costs including the charges United must pay to other pipelines for transporting and compressing United's gas. Thus NOPSI argues that the fixed costs of transporting and compressing gas by others should be allocated 25% to United's demand charge and 75% to United's commodity charge. Such thorough-going application of the *United* method would have resulted in lower rates in the southern zone, according to NOPSI witness, Henry C. Owen, Jr.

not supported by the evidence. This objection is in reality an objection to the cost classification and allocation method used in both settlements.[12] Because the cost classification and allocation issue is dispositive of this issue, we now turn to it.

### III. COST CLASSIFICATION AND ALLOCATION

NOPSI's central objection to the settlements in both proceedings relates to the continued use in those settlements of the *United*[13] method of cost classification and allocation by which United recovers its costs of service and makes a return on its investment. The *United* methodology is a two-part rate, with a demand component and a commodity component. The demand component is related primarily to the utility's fixed costs and the commodity component relates more directly to the utility's variable costs. Fixed costs are associated with a customer's basic entitlement to receive gas and with the system's maintenance of capacity sufficient to meet maximum or "peak" needs. Fixed costs include investment in pipeline facilities, taxes, depreciation. Variable costs include, for example, the cost of the gas itself and the cost of compressor station fuel. Variable costs vary in relation to the volume of gas delivered to a given customer. *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 582 n.12 (D.C. Cir. 1979). "Commodity costs are recovered by a cents-per-mcf commodity charge, which is paid by all customers on the basis of the total volume of gas actually delivered (annual use).... Demand costs are recovered by a fixed monthly demand charge paid by those who have a contractu-

al right to demand specified quantities of gas on peak days. The demand charge may be calculated according to the maximum amount that the customer has a right to demand as specified in the service agreement, or on the basis of the highest daily take for each customer during the past twelve months." *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176, 1180 (D.C. Cir. 1975).

Rate making for a pipeline involves several steps. First, the pipeline's total cost of rendering service must be determined. Next, the proportion of these costs incurred by each of the pipeline's rate zones must be determined. This second step, cost classification, involves determining whether costs are fixed or variable and whether they should be recouped through demand or commodity charges. Within each geographical zone, costs are then allocated among classes of customers, for example, jurisdictional customers and nonjurisdictional customers. Rate design, the last step, involves computation of the rate to be charged customers in each rate zone. *See Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 582 n.12 (D.C. Cir. 1979); *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176, 1179–80 (D.C. Cir. 1975). The rates thus computed "enable the pipeline to recover from its customers in each rate zone the portion of total system costs allocated to that zone." 628 F.2d at 582 n.12.

Under the *United* formula, twenty-five percent of fixed transmission costs are recovered through the demand charge and the remaining seventy-five percent of fixed costs, together with all variable costs, are recovered through the commodity charge.[14]

---

12. NOPSI argues "the record evidence in the second proceeding made it clear that the 'Settlement' could not properly be adopted as a resolution of the rate issues *on the merits* because such evidence did not show that the cost classification and allocation methods, a major feature of the 'Settlement,' were just and reasonable or were the methods previously preferred and approved for rate filings by United." Brief at 36–37.

13. *See* note 3, *supra*.

14. The effect of allocating a portion of fixed costs to the demand component is greater on city gate customers, such as NOPSI, whose purchases fluctuate in volume considerably between the cold winter season of high demand and the slack summer season. *See* 520 F.2d at 1180. Such a purchasing pattern is called taking at a low load factor. 520 F.2d at 1180. As the court in *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578 (D.C. Cir. 1979), explained, "A customer's annual 'load factor' is the percentage relationship of its average daily demand to its maximum daily demand. Thus,

Variable costs, as well as seventy-five percent of fixed costs, are assigned under the *United* formula, by virtue of their recovery through the commodity component, on a straight volumetric basis, *i. e.*, in direct proportion to the annual volumes purchased by or transported for each customer. The dispute in this case concerns only the assignment of fixed costs.

NOPSI's argument is that all costs, both fixed and variable, should be classified and allocated on a straight volumetric basis. Under the straight volumetric method, all costs would be assigned one hundred percent to the commodity component. NOPSI argues that use of a straight volumetric method is required because the Federal Power Commission, in Opinion No. 671, *United Gas Pipe Line Co.*, 50 F.P.C. 1348 (1973), "approved and expressed its preference for assigning all of United's costs, both fixed and variable, to the commodity category, and then allocating those costs between the different classes of service, including jurisdictional and nonjurisdictional, on the volumetric method which was proposed by its staff." NOPSI brief at 38.[15] NOPSI argues that the straight volumetric method of cost classification and allocation

was not actually applied by the Federal Power Commission in the proceeding in No. 671 only because the Commission found United would experience economic disruption as a result of a change from the then-existing *Seaboard*[16] formula (under which fixed costs were allocated fifty percent to the demand component of the rate and fifty percent to the commodity component) to a one hundred percent commodity allocation. A change to the straight volumetric method would not be disruptive of the United system, NOPSI argues. The implication of NOPSI's argument is that the Commission in No. 671 intended to give the straight volumetric method presumptive validity so that in future proceedings a natural gas company seeking a rate increase based on a different cost allocation method would be required, as part of its showing that its proposed rates were just and reasonable, to make a special showing that deviation from the "status quo" straight volumetric cost allocation method was justified.

We reject NOPSI's argument for several reasons. First, we do not read the Commission's Opinion No. 671 to require use of the straight volumetric method of cost classifi-

---

high load factor customers tend to take a relatively steady supply of gas throughout the year, either because they have constructed storage facilities or because they serve industrial customers not subject to weather-related fluctuations characteristic of residential consumers. Low load factor customers tend to have needs that fluctuate considerably. These are often 'city gate' customers, typically local distribution companies that do not have storage facilities, that take gas at the 'city gate' for sale to commercial and residential users. *See* Garfield and Lovejoy, *supra*, n. 12 at 171–72, 175." 628 F.2d at 584 n.19, referring to P. Garfield and W. Lovejoy, *Public Utility Economics* (1964). It is evident that NOPSI would favor allocating costs to the commodity component. As the court pointed out in *Consolidated Gas*, "Commodity charges are relatively more significant for high load factor customers—pipeline customers who receive a relatively steady supply throughout the year either because they service industrial customers not subject to the weather-related fluctuations characteristic of human needs, or because they have constructed storage facilities to which they can route any summer receipts in excess of their customer's summer requirements. Any shift towards the com-

modity component of the tariff increases the relative burden borne by the high load customers." 520 F.2d at 1180.

**15.** NOPSI's argument is that use of the straight volumetric method of cost allocation is the proper method of cost classification and allocation for several reasons. NOPSI points out that the supply of natural gas is decreasing, as evidenced by the curtailment programs which have been implemented. With such decrease in the flow of gas, pipeline capacities far exceed any possible demand. Although investment was once necessary to provide expanded pipeline capacity to take care of peak demand, such a consideration no longer makes sense, NOPSI argues.

**16.** The. *Seaboard* method of cost classification and allocation was adopted by the Federal Power Commission in *Atlantic Seaboard Corp.*, 11 F.P.C. 43 (1952), and approved by the Eighth Circuit Court of Appeals in *State Corporation Commission of Kansas v. FPC*, 206 F.2d 690 (8th Cir. 1953), *cert. denied*, 346 U.S. 922, 74 S.Ct. 307, 98 L.Ed. 416 (1954).

cation and allocation.[17] Instead, we agree with the Commission that the *United* 25%–75% method represents the status quo for United's system. In addition, we do not think that either the pipeline (United) or the Commission was required to make a special showing [18] that continued use of the *United* 25–75 method of cost classification and allocation, which has been used in United's system since 1973, was justified. On the contrary, in order for the Commission to have departed from the 25–75 method, which had become the established methodology and was supported by the pipeline, the Commission would have had to explain the departure or found use of the 25–75 method unjust and unreasonable.

We begin our explanation with a consideration of the Commission's opinion in No. 671, *United Gas Pipe Line Co.*, Docket No. RP72–75, 50 F.P.C. 1348 (1973). Prefacing its analysis of the cost allocation and rate design issue, the Commission noted that it had recognized in an earlier opinion that "a searching reappraisal of cost classification and allocation and rate design was required in order that the Commission can effectuate a more efficient allocation of our finite natural gas reserves." 50 F.P.C. at 1352. The proceeding before it represented "the first adjudicated case with a substantial and probative evidentiary record for the Commission to determine the appropriate method of cost classification, allocation and

rate design to serve the overall public interest." 50 F.P.C. at 1352. The Commission indicated that as options for the appropriate method of cost classification, allocation and rate design, it would "consider the appropriateness of the straight *Seaboard* method or a *Seaboard* method revised or modified . . . so as to shift additional costs from the demand category to the commodity category, and the volumetric method . . . ." 50 F.P.C. at 1353. The Commission concluded that there was a need to revise the *Seaboard* formula and stated, "[t]he need for a revision in the *Seaboard* formula arises principally from the fact that utilization of United's pipeline system is declining, both on a peak and annual basis, due to a gas supply shortage." It went on to say, "Under this circumstance, it becomes particularly important that any revision be consistent with the regulatory precepts of equitable treatment and the assignment to each class of customer of their fair share of the costs. Whereas in *Seaboard*, the Commission concluded that neither peak nor annual use of the pipeline system predominated, we now find that greater emphasis must be placed upon the annual use of United's pipeline system." 50 F.P.C. at 1361. Recognizing that the straight volumetric method had advantages and that "volumetric allocation and design is supportable on the record herein," 50 F.P.C. at 1352, the Commission nevertheless concluded that "fixed costs of

---

**17.** Because we do not believe that Opinion No. 671 establishes the straight volumetric method as the required cost allocation and classification formula, we need not reach NOPSI's contentions about potential economic disruption. However, as a further response to NOPSI's argument that the Commission's failure to employ the straight volumetric method in Opinion No. 671 hinged on its determination that a change to that method would cause economic disruption to United's system, we observe that the Commission in the instant case found that NOPSI had failed to show that the disruption in this case would be any less than the disruption found significant in Opinion No. 671. J.A. at 125–28.

**18.** NOPSI seems to be arguing that after Opinion No. 671, the straight volumetric method became the status quo for the United system and that a change from that method requires a determination that it produces unjust and un-

reasonable results. We have rejected the position that the straight volumetric method is the status quo for the United system and have affirmed the Commission's finding that the United 25%–75% formula represents the status quo. In addition, we have held that when the pipeline proposes rates based on the status quo or old cost classification and allocation method, it need not re-prove that method. *See* pp. 523–524, *infra. See also Mississippi Valley Gas Co. v. FERC*, 659 F.2d 488 (5th Cir. 1981), decided today by this same panel, which holds that the § 5(a) [15 U.S.C.A. § 717d(a) (West 1976)] burden upon the Commission to find an old cost classification and allocation method unjust and unreasonable before it can impose a new method upon a pipeline is not applicable when the pipeline itself proposes a change in its cost classification and allocation method.

the storage and transmission functions should be assigned in a ratio that is midway between the *Seaboard* 50–50 ratio and the volumetric method. We therefore conclude that, as a matter of policy, seventy-five percent of the fixed costs should be assigned to the commodity category and twenty-five percent should remain in the demand category." 50 F.P.C. at 1362.

Contrary to NOPSI's reading of Opinion No. 671, we do not believe that the Commission there adopted as the ideal a straight volumetric method of cost allocation and simply declined to apply it in the particular case before it because of the economic disruption such a shift in cost allocation methods would cause. It is true that in deciding not to adopt the straight volumetric method, the Commission was very much concerned about the disruptive impact of a shift from the 50–50 demand commodity *Seaboard* method to a 100% commodity method. The Commission said, "The volumetric method would add approximately $10,000,000 to the pipeline and industrial customers' gas costs (of which $4,000,000 would apply to nonjurisdictional industrial sales). We think that such a sudden change may be disruptive to United system in that at this time a more moderate shift would be in the public interest." 50 F.P.C. at 1362. However, we read Opinion No. 671 as weighing all the evidence and adopting the 25–75 method, now commonly referred to as the *United* method. Although the Commission concluded that the record before it could support adoption of the volumetric method, the record also supported the 25–75 method and the Commission deliberately chose to adopt the 25–75 method instead. At the same time, the Commission left open the possibility that, on the proper showing and in the proper circumstances, it might approve a straight volumetric method in a future case.

Nor did the court in *Consolidated Gas Supply Corp. v. FPC*, 520 F.2d 1176 (D.C. Cir. 1975), approve as ideal the straight volumetric method of cost classification and allocation. In *Consolidated Gas*, the District of Columbia Circuit gave judicial sanction to the 25–75 *United* methodology adopted by the Commission in Opinion No. 671. The court noted that "the decision in *Atlantic Seaboard* to devise a two-part formula was based on the Commission's recognition that the facilities responsible for the fixed costs 'perform both a capacity and a volumetric function.' The facilities are built to supply maximum demand, for the pipeline must always have the capacity available to meet those requirements, whether or not it is used on any given day." 520 F.2d at 1180–81 quoting from 11 F.P.C. at 53. (footnote omitted). The court observed, however, that changed circumstances since the adoption of the *Seaboard* formula made it less sensible to attribute fixed costs to the demand component of the two-part rate. The court noted that the effect of attributing fixed costs to demand rather than to commodity is to encourage additional gas purchases because a customer paying a demand charge incurs, on an incremental basis, only the commodity charge as to any additional purchases. However, the court said, "[d]ue to the increasing costs of coal and oil and the growing scarcity of natural gas, it is no longer necessary to lure industrial customers with relatively low commodity charges." The court also said:

> [S]ince some pipeline capacity now goes unused even on peak days, the demand charge no longer has the same vitality as a premium for reserving priority use of a scarce resource. A given customer may have a right to a greater share of the gas available on peak days, but that is subject not only to the limitations of supply, but to the strictures of the curtailment programs. A customer does not pay a premium for the guarantee of a place when he knows that the train, or theater, or whatever, will be partly empty in any event.

520 F.2d at 1186 (footnote omitted). The court nevertheless stated, "Our ruling in this case affirming the 25%–75% classification of fixed costs decreed by the Commission does not require that we embrace or approve the Commission's view that a 100% classification of fixed costs to the commodity component would be proper." 520 F.2d at 1186–7.

Opinion No. 671 and the decision in *Consolidated Gas Supply Corp. v. FPC*, reflect the view that there is less corrolation between pipeline capacity and peak day use than previously existed. This is so because of increasing limitations on the availability of natural gas. However, the Commission's Opinion No. 671 and the District of Columbia Circuit's opinion in *Consolidated Gas* do not, as NOPSI argues, require application of the straight volumetric method of cost allocation henceforth. Instead, they established the 25–75 method of cost classification and allocation as the status quo. The Commission in the instant case recognized the *United* method as the status quo. J.A. at 128. We agree and reject NOPSI's argument to the contrary.

Having held that the Commission in the instant case properly considered that the United method was the "status quo," we conclude that NOPSI's argument that United failed to make some required "special showing" to justify deviation from the straight volumetric method falls of its own weight. Contrary to NOPSI's view, United has no burden to re-prove its established 25 percent-75 percent methodology. In a section 4 [19] proceeding such as this, the natural gas company seeking a rate increase, *i. e.*, United in this case, has "the burden of proof to show that the increased rate or charge is just and reasonable . . . ." [20] However, this burden does not include the requirement that United prove by a preponderance of the evidence that its established methodology is appropriate. The District of Columbia Circuit, reviewing an order of FERC which imposed a new basis for allocating a natural gas company's costs attributable to distance, indicated that section 4(e) of the Natural Gas Act, 15 U.S.C.A. § 717c(e) (West 1976), places on the petitioner filing for higher rates the burden of justifying its higher rates, but stated: "[w]e agree that . . . [the natural gas company] had the burden of proof on the rate of return question, but we cannot accept the proposition that because a company

files for higher rates, it bears the burden of proof on those portions of its filing that represent no departure from the status quo." *Public Service Commission v. FERC*, 642 F.2d 1335, 1345 (D.C. Cir. 1980), *U.S. Appeal Pending.* The court went on to hold that, even though the natural gas company had initiated the rate increase under section 4, because the pipeline had not requested a change in its cost allocation method, the Commission could not impose such a change without following the section 5(a) procedures which require the Commission to find the old cost allocation method "unjust, unreasonable, unduly discriminatory or preferential" before it could impose a new method. 642 F.2d at 1345–46. In other words, the District of Columbia Circuit held that a pipeline proposing a rate increase need not re-prove an established cost allocation method, but rather that the Commission would be required to show that the old method was unlawful before requiring a change to a new method. This result is consistent with the District of Columbia Circuit's view expressed in *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578 (D.C. Cir. 1979). There the court, speaking of the Commission's decision to depart from the *Seaboard* formula which it had applied to the Texas gas pipeline for nearly twenty-five years, said "[d]ecisions of both the courts of appeals and the Commission have held that the Commission bears the burden of explaining the reasonableness of any departure from a long-standing practice, and any facts underlying its explanation must be supported by substantial evidence." 628 F.2d at 586 n.31.

In the instant case, the Commission considered whether departure from the *United* formula was warranted. It took into account the fact that the *United* method had been the established formula since its adoption by the Commission in 1973. The Commission observed:

> No specific formula is mandated in arriving at just, reasonable and nondiscriminatory rates. The Commission may make

---

**19.** 15 U.S.C.A. § 717c(e) (West 1976).

**20.** *Id.*

pragmatic adjustments which may be called for by particular circumstances. But where a particular formula has been used for many years, that formula is a starting point for determining the overall reasonableness of the pipeline rates. On United's system the particular method of cost classification, allocation and rate design, which has come to be known as the *United* formula, has been in use for several years. The Commission may not lightly disregard that background. A departure from the 25 percent-75 percent method of apportioning costs must be supported with a reasoned explanation and substantial evidence. On the basis of the record before us, the Commission finds United's arguments sound and is unable to find that NOPSI's arguments are sufficiently persuasive to move off the starting point of the *United* formula.[21] The method of Opinion No. 671 currently used remains preferable and certainly cannot be said on this record to yield an unjust and unreasonable result. J.A. at 128 (footnotes omitted). We will not disturb the Commission's determination.

We conclude that there was no error in the Commission's approach. We follow the District of Columbia Circuit's decision in *Public Service Commission v. FERC, supra,* and hold that United was not required to make a special showing that continued use of the *United* 25%–75% methodology was warranted. It was only required to prove that the settlement rates based on the *United* methodology were just and reasonable, but was not required to re-prove the estab-

lished cost methodology. The Commission's determination is supported by substantial evidence. Accordingly, we affirm the orders of the Commission approving the settlement agreements.

AFFIRMED.

---

21. The Commission's findings amply support its conclusion that departure from the *United* method is not warranted. The Commission noted:

United constructed capacity to meet the peak contractual demands of its customers. While curtailment has prevented these demands from being fully met, it is still reasonable to assign some of the capacity costs on the basis of the nature of the demands imposed by different customers on the pipeline system. Those customers with predominantly temperature sensitive loads imposed demands for which capacity must be available and frequently require operational flexibility which may also generate the need for invest-

ment. Additionally, the level of utilization during periods of peak demand requires investment decisions, particularly with regard to the need to replace or retire facilities and equipment. Thus it is both equitable and appropriate that peak utilization be recognized as contributing to cost responsibility. J.A. at 128. Thus, the Commission in the instant case concluded that continued allocation of some part of fixed costs to the demand component was just and reasonable, despite the reduced significance of capacity. We see no reason to upset these findings.

\* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.